UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STEVEN ZELENIKA, NICHOLAS CAPORELLI and CHARLES RANEY, | ) ) ) No. 09 CV 2946 |
| Plaintiffs, | ) ) |
| v. | ) ) ) Judge Pallmeyer |
| COMMONWEALTH EDISON, an Exelon corporation, | ) Magistrate Judge Valdez ) ) |
| Defendant. | ) |

## COMED'S LR 56.1(a)(3) STATEMENT OF MATERIAL FACTS

Defendant Commonwealth Edison, an Exelon corporation ("ComEd"), in support of its Motion for Summary Judgment and in accordance with LR56.1(a), submits this statement of material facts as to which there is no genuine issue and which, as demonstrated in ComEd's accompanying Memorandum of Law, entitle ComEd to judgment as a matter of law.[1] Portions of the record and other materials cited as support for these facts are appended hereto, covered by an index.

### THE PARTIES

1.  ComEd is a public utility that delivers electrical power around the clock and 365 days a year to some 3.7 million commercial and residential customers throughout Northern Illinois including the Chicago metropolitan area. Affidavit of Robert L. Pinto ("Pinto Aff."),

---

[1] ComEd bases this statement of fact to a large extent on Plaintiffs' own averments and testimony, some of which ComEd accepts as true only for purposes of its Motion for Summary Judgment. ComEd reserves the right to contest such facts at trial, if trial is necessary.

¶¶ 3, 4; Deposition of Charles Raney ("Raney dep.") at 59; Deposition of Julian Smith ("Smith dep.") at 31.

2.  ComEd's electrical distribution system, including electrical substations, transformers, overhead wires and underground cables, is coordinated from a centralized facility known as ComEd's Operations Control Center or "OCC," located in Joliet, Illinois. From the OCC, ComEd, among other things, coordinates all necessary maintenance of and repairs to the system, thereby helping to ensure the safety, reliability, and efficiency of electrical service to customers. Pinto Aff., ¶¶ 3, 10-11; Declaration of Nicholas Caporelli filed June 30, 2010 ("Caporelli Decl."), ¶ 4; Smith Dep. at 54-55.

3.  Like the electrical distribution system itself, the OCC operates on an around-the-clock basis, 365 days a year. Pinto Aff., ¶ 4.

4.  ComEd employs more than 100 persons referred to as "Dispatchers" at the OCC. Since at least 2006, ComEd has classified those Dispatchers as either Distribution System Dispatchers I or II ("DSD Is or DSD IIs") or Senior Distribution Systems Dispatchers ("Sr. DSDs"). Before those job titles were introduced, the Sr. DSDs were called "Load Dispatchers" and the others were called "Operating Dispatchers." Pinto Aff., ¶¶ 4, 7; Caporelli Decl., ¶¶ 3-5; Declaration of Steven Zelenika filed June 30, 2010 ("Zelenika Decl. No. 2"), ¶¶ 3-5. For purposes of this Statement of Facts, these employees will be referred to collectively as "Dispatchers" without record to their precise titles, unless the precise titles are specified.

5.  Although there are some differences in functions and responsibilities among Dispatchers, regardless of specific title all ComEd Dispatchers use computer displays, alarm systems, maps and controls to monitor the status of the ComEd electrical distribution system and adjust voltages on the system. They also direct ComEd crews in the field by telephone and radio

to, among other things, take distribution system equipment out of service for maintenance or repairs and redirect power to restore customers as quickly and safely as possible after outages. Pinto Aff., ¶ 8; Caporelli Decl. ¶¶ 3-5; Declaration of Steven Zelenika filed August 20, 2009 ("Zelenika Decl. No. 1"), ¶ 7; Zelenika Decl. No. 2, ¶¶ 3-5.

6. All the named and opt-in Plaintiffs in this case were ComEd Dispatchers at some point in the relevant time period, but none of them remained employed by ComEd when he filed or joined this suit. The named plaintiffs – Steven Zelenika, Nicholas Caporelli and Charles Raney – worked only as Sr. DSDs during the period of time relevant to the case. Fourth Amended Complaint ("Complaint"), ¶¶ 6-8; Pinto Aff., ¶ 7; Zelenika Decl. #2, ¶ 3(c); Caporelli Decl., ¶ 3(c); Raney dep. at 21-22. Five other individuals ("the opt-in plaintiffs") consented to join the FLSA claims when the Court allowed individuals to do so. Three of them – David Kaktis, David Karriman and Thomas Parish – worked as Sr. DSDs during the time relevant to the case. Opt-in plaintiff Julian Smith worked as a DSD II during the relevant time, and Anthony Lotarski worked as a DSD I. Plaintiffs' Complete Consent Forms; Smith dep. at 22, 111-12.

7. None of the named plaintiffs filed a consent to join in the Fair Labor Standards Act ("FLSA") claims in the Complaint.[2] See, Plaintiff Consent Forms filed with Court on October 20, 2010 (Doc. #75); Raney dep. at 9-10; Deposition of Nicholas Caporelli ("Caporelli dep.") at 10. Plaintiff Zelenika testified that he is not sure but thinks he signed a Consent. Zelenika dep. at 11. However, no consent for Zelenika was filed with the Court. (Doc. #75.)

8. The opt-in Plaintiffs other than Smith have agreed that they will not testify or otherwise offer evidence in this case but instead will be bound by the testimony of plaintiffs

---

[2] As referred to in ComEd's summary judgment papers, the "Complaint" is the currently-pending version, Plaintiffs' Fourth Amended Complaint, Doc. # 44.

3

Zelenika, Caporelli, Raney and Smith for purposes of their claims. See, Waivers of Right to Testify And Consents to be Bound Submitted by Plaintiffs Kaktis, Karriman, Parish and Lotarski.

## JURISDICTION AND VENUE OF PLAINTIFFS' CLAIMS

9. Counts III and IV of the Complaint have been dismissed. (Docket No. 25, Sept. 16, 2009; Docket No. 39, Feb. 24, 2010; Docket No. 54, June 9, 2010.) Count I of the Complaint asserts claims for unpaid overtime compensation under the Fair Labor Standards Act, 29 U.S.C. § 207. Complaint, Count I. The Court has jurisdiction of those claims under 28 U.S.C. § 1331. Count II asserts claims for unpaid overtime compensation under the Illinois Minimum Wage Law, 820 ILCS 105/1 *et seq.* Complaint, Count II. In Count V, Plaintiff Zelenika asserts a claim for retaliatory discharge under Illinois common law. Complaint, Court V. The Court may exercise supplemental jurisdiction over the State law claims under 28 U.S.C. § 1367.

10. Since the named Plaintiffs reside and/or worked for ComEd in this judicial District (Complaint, ¶¶ 1-3), and since ComEd's principal place of business is in this District (Complaint, ¶ 4), venue is proper under 28 U.S.C. § 1391(b).

## COMED'S DISPATCHERS ARE OVERTIME-EXEMPT EMPLOYEES

11. ComEd's Dispatchers work in an office setting, seated at desks in the OCC, monitoring computer displays and alarm systems, receiving reports of customer outages and service needs, and communicating by telephone and radio with ComEd work crews in the field. The Dispatchers do not go into the field or perform manual work themselves. Zelenika dep. at 196-97, 200, 214; Raney dep. at 75, 79; Caporelli Decl. ¶ 3; Caporelli dep. at 33-34; Smith dep. at 50-60.

12. Although as stated, ComEd classifies the Dispatchers in three different position titles – DSD I, DSD II and Sr. DSD – all three positions are responsible for monitoring ComEd's power distribution system, overseeing service to the system, and responding to customer complaints and power outages. Pinto Aff., ¶ 8 and attached position descriptions (Pinto Aff. exhs. A-1 through A-3); Zelenika Decl. #2, ¶¶ 3-5; Zelenika dep. at 219-20; Caporelli Decl., ¶¶ 3-5; Raney dep. at 53-54, 63; Smith dep. at 46-47; Deposition of Robert Pinto ("Pinto dep.") at 87.

13. At the OCC, ComEd's distribution system is divided into regions and areas with at least one Dispatcher assigned to cover each such region at all times. Pinto Aff., ¶ 6; Zelenika dep. at 197-198, 214-215; Caporelli dep. at 62-63. When on duty, a Dispatcher is "the basic overseer" or "coordinator" of his/her assigned segment of the distribution system. Raney dep. at 71, 89.

14. Dispatchers receive reports of power outages or other power delivery problems from customers directly or *via* ComEd computer and alarm systems that the Dispatchers monitor at their desks. Dispatchers then are responsible for helping to resolve those problems and to restore power to customers as quickly as possible. Pinto Aff., ¶ 12; Smith dep. at 47-50; Caporelli Decl. ¶¶ 3-4; Zelenika Decl. #2, ¶¶ 3-4; Raney dep. at 63-65.

15. The ComEd crews in the field with whom Dispatchers communicate typically are in ComEd vehicles. Dispatchers direct those personnel to particular locations to troubleshoot problems, respond to power outages, and take distribution equipment out of service ("isolate") or re-energize such equipment for maintenance and repairs and to restore customers power. Pinto Aff., ¶¶ 8, 10-12; Zelenika Decl. #2, ¶¶ 3-4; Caporelli Decl., ¶¶ 3-4; Smith dep. at 68.

16. Specific ComEd work crews are assigned to a Dispatcher by the work crews' departments at the beginning of each shift. Each crew typically consists of one field worker. During any shift, a Dispatcher may direct anywhere from a handful to more than 20 field crews. A Dispatcher may request that additional crews be placed at his/her disposal if the Dispatcher feels additional crews are needed to complete needed work. Zelenika dep. at 202-04; Caporelli dep. at 57-58; Raney dep. at 91-94; Smith dep. at 71.

17. When repairs to the ComED distribution system are scheduled in advance, a "switching routine" that will take the to-be-repaired equipment out of service and redirect power in the interim typically is prepared by ComEd "Arrangers." In such instances, the ComEd Dispatcher who is on duty when the work is scheduled to be performed must review that switching routine before allowing the work to proceed, to assess whether the routine can safely be executed under then-existing system conditions. Raney dep. at 108-10. Under ComEd procedures, field crews are not permitted to proceed to execute such routines until the Dispatcher gives his approval. Zelenika dep. at 58-59; Caporelli dep. at 73-74, 77, 89, 133; Smith dep. at 74-76, 95-96, 114-15, 119; Raney dep. at 121-22, 200-01.

18. In an emergency, such as a sudden power outage or a power line being down in a street, where no switching routine has been planned or prepared in advance to address the problem, the Dispatcher on duty must respond by dispatching crews to the scene to troubleshoot the problem and by designing or helping to design a switching routine "on the fly" to isolate the downed equipment, make the necessary repairs, and restore power. Caporelli dep. at 104-05, 119-20; Raney dep. at 151-53, 173-74; Smith dep. at 94-95.

19. ComEd typically experiences 100 or more unplanned power outages a day. Smith dep. at 104; Raney dep. at 173.

20. Dispatchers are responsible for assuring the safety of the public and the work crews they dispatch. Raney dep. at 65; Smith dep. at 65; Zelenika dep. at 219-20. In giving their directives to field crews to energize or de-energize equipment, ComEd's Dispatchers "have the safety of field personnel in their hands." Zelenika dep. at 71-72. Errors by Dispatchers can also cause damage to equipment, power outages and loss of customer good will. Smith dep. at 123-24; Pinto dep. at 20.

21. ComEd gives new Dispatchers some four months of classroom training, followed by on-the-job shadowing of experienced Dispatchers, before a new Dispatcher is allowed to begin performing the job on his or her own. Smith dep. at 30-34; Raney dep. at 48-52; Caporelli dep. at 47-48, Zelenika dep. at 194.

**THE DISPATCHERS ARE HIGHLY-COMPENSATED AND PAID ON A SALARY BASIS**

22. Plaintiffs admit that, throughout the relevant time period, they were paid by ComEd "on a salary basis regardless of the number of hours worked each workweek." Complaint, ¶¶ 26, 33.

23. While employed as Dispatchers, the Plaintiffs knew they were classified by ComEd as "exempt, salary grade" personnel. Smith dep. at 19-22; Raney dep. at 27-28; Zelenika dep. at 26.

24. ComEd pays its Dispatchers every two weeks, based on two-week pay periods. From 2006 to the end of their employments, each plaintiff received a base salary payment from ComEd amounting to at least $910 per two-week pay period, plus additional compensation under ComEd policies that entitled them to extra pay for such things as shift differential or for working "extended hours." Affidavit of Brenda Martin ("Martin Aff."), ¶¶ 4-5; Zelenika dep. at 28-29; Raney dep. 26-35, 43-44; Deposition of Mark Quinlan ("Quinlan dep.") at 15.

25. The Plaintiffs never had their regular bi-weekly salary payments reduced or "docked" for failing to show up for work on time. Zelenika dep. at 28-29, 203; Raney dep. at 283; Smith dep. at 176. The Plaintiffs never saw a ComEd policy that provided for such docking of Dispatcher salary payments, nor do they know of any other ComEd dispatcher whose salary payments were docked under such circumstances. Zelenika dep. at 203; Smith dep. at 176-77. Exelon does not have a policy of "docking" or reducing an exempt salary grade employee's base salary payment in any pay period due to the employee's having been late for work on any occasion(s) during the pay period, and in fact Exelon audits exempt employees' salary payments each year to verify that any deductions have been in compliance with FLSA requirements. Martin Aff., ¶ 6.

26. At some time before the year 2000, ComEd paid its "Operating Dispatchers" at "time and one-half," or sometimes even at "double-time," for extra hours they worked in excess of 40 hours in a workweek. When that was ComEd's practice with respect to Operating Dispatchers, however, ComEd did *not* pay its "Load Dispatchers" any extra compensation for working extra hours; the Load Dispatchers merely received "compensatory time off" for working extra hours. Zelenika dep. at 140, 260; Peretti dep. at 35-39; Pinto dep. at 14-15; Quinlan Dep. at 13; deposition of Richard Urban ("Urban dep.") at 8.

27. From at least 2006 until the present, ComEd's policy and practice has been to pay all Dispatchers extra compensation at "straight time" rates for extra hours they work beyond their normally scheduled shifts. Smith dep. at 124, 128; Zelenika dep. at 260; Caporelli dep. at 44; Raney dep. at 29. ComEd computes the "straight-time" rate at which a Dispatcher is paid for such "Extended Hours" by dividing the Dispatcher's annual base salary by 2080 hours, to arrive at a "straight-time" base hourly rate. Martin Aff., ¶ 7.

8

28.   From at least 2006 until the end of their employments, the plaintiffs were highly-compensated employees whose total compensation from ComEd exceeded $100,000 annually. Raney dep. at 45-47 and Dep. Ex. R-2; Caporelli dep. at 44-46 and Dep. Ex. C-5; Smith dep. at 28-30 and Dep. Ex. S-2; Zelenika dep. at 27 and Dep. Ex. Z-8.

**EVENTS LEADING TO PLAINTIFF ZELENIKA'S DISCHARGE**

29.   Plaintiff Zelenika, like ComEd's other Dispatchers, was aware that Exelon's policies forbade him and ComEd employees generally to use the ComEd email or computer systems to access, distribute or exchange inappropriate images or messages. Zelenika dep. at 146; Smith dep. at 144-45; Raney dep. at 221. Zelenika understood that pornographic materials were considered inappropriate under those policies. Zelenika dep. at 154. In fact, Zelenika was warned by ComEd in 1998 about using ComEd's electronic communications system to circulate inappropriate items. Zelenika dep. at 155-56; Urban dep. at 12-15.

30.   Among the corporate policies forbidding such behavior were Exelon's "Information Technology Procedure IT-AC-554: Acceptable Use of Electronic Information Assets" (hereafter, the "Acceptable Use" policy). Affidavit of Theresa Strayer ("Strayer Aff."), ¶ 6. While he was employed, Zelenika acknowledged to ComEd his having received and reviewed the Acceptable Use policy. Zelenika dep. at 152-53 and Dep. Ex. Z-3.

31.   The Acceptable Use policy expressly defined "Electronic Information Assets" to include ComEd's computer and electronic mail systems. The policy also expressly defined "Objectionable" material to include "verbiage or content that would be reasonably considered vulgar, offensive, obscene, indecent, distasteful, disruptive, harassing, defamatory or derogatory, including but not limited to sexual comments or images." Further, the policy provided that "Objectionable material may not be sent by email or any other form of electronic communication

9

... using Electronic Information Assets ..." The policy also stated that "[v]iolations ... may result in disciplinary action up to and including discharge and legal action." Strayer Aff., ¶ 6 and Strayer Aff. Ex. A, §§ 1.2, 2.3, 2.6 and 4.1.

32. In addition, ComEd employees were subject to the Exelon Corporation Code of Business Conduct, which provided, *inter alia*:

> Computer and Electronic Information Security
>
> Exelon's computer, telecommunications and other electronic information resources are Company Assets. They consist of all of the Company's information technology infrastructure and applications such as computer hardware, software applications, networks, e-mail and voicemail systems. ...
>
> Main Obligations
>
> - Use Computer and Information Resources only for Company business purposes and for the exclusive use of employees and authorized suppliers and their employees.
> - Incidental personal use of these resources may be permitted so long as the use is reasonable and does not interfere with work responsibilities or expose Exelon to potential liability.
>
> \* \* \*
>
> - Use Computer and Information Resources responsibly and in accordance with law and the Acceptable Use Computer Procedure.
> - Do not access, solicit or transmit inappropriate messages or materials (*e.g.*, sexually oriented, pornographic, violence or hate related, discriminatory, *etc.*) utilizing Computer and Information Resources...

Strayer Aff., ¶ 7 and Aff. Ex. B.

33. ComEd employees also were subject to Exelon policies forbidding employees to sexually, racially or otherwise improperly harass other employees. Strayer Aff., ¶ 3.

34. In September 2006, ComEd Dispatcher Sean O'Malley complained to his managers at the OCC that O'Malley felt his co-workers were harassing him and that some of his coworkers were using ComEd's email and computer systems to view and exchange offensive sexual or pornographic images. The OCC managers instructed Patrick Hallihan, a ComEd

Senior Human Resource Generalist with responsibility for the OCC, to arrange for an investigation of O'Malley's complaint by Exelon personnel who were independent of the OCC. Deposition of Vincent Ransom ("Ransom dep.") at 47-54; deposition of Timothy McGuire ("McGuire dep.") at 12-15, 20-21; deposition of Patrick Hallihan ("Hallihan dep.") at 16-18, 29-30.

35. Accordingly, ComEd called on Theresa Strayer, in Exelon's Case Management/Employee Dispute Resolution unit, to conduct the investigation, because Strayer conducted independent, internal investigations of employee harassment claims throughout Exelon. Hallihan dep. at 17-18; McGuire dep. at 12-13, 18-19; Strayer Aff., ¶ 3. In that capacity, Strayer had conducted more than 100 internal investigations for Exelon. Strayer Aff., ¶ 3.

36. On September 27, 2006, Ms. Strayer met with Mr. O'Malley at the OCC to obtain specifics from him regarding the matters about which he was complaining. In the course of that interview, O'Malley gave Strayer the names of eight Dispatchers who, according to O'Malley, had viewed or exchanged inappropriate items via ComEd's computer and email systems. The Dispatchers whom O'Malley named did not include Plaintiff Zelenika. Strayer Aff., ¶¶ 5, 8-9.

37. Having obtained from O'Malley the names of the allegedly offending OCC employees, Strayer asked ComEd's Corporate Security and Information Technology ("IT) Department to download, for inspection, the contents of the named employees' ComEd email accounts and records of their internet activity. Strayer Aff., ¶ 10.

38. Ms. Strayer, initially assisted by Exelon Human Resources, Law Department and Corporate Security Department officials, then inspected the contents of each disk onto which the IT Department had downloaded those employees' emails and internet activity. For each

11

employee identified by O'Malley, disks were prepared containing the contents of the employee's email mailbox and a record of the internet websites he had visited. When, in examining the disks' contents, Strayer or her team found inappropriate items that appeared to have been sent to the subject employee by another ComEd employee, or by the subject employee to another ComEd employee, Strayer expanded the investigation by directing the IT department to similarly download the contents of that other employee's email mailbox for inspection. In this way, Strayer's investigation of email and internet usage at the OCC eventually expanded from the eight employees O'Malley had named to some 19 employees. Strayer Aff. ¶11.

39. Although Sean O'Malley had not mentioned Plaintiff Zelenika as one of the Dispatchers O'Malley had seen viewing or exchanging inappropriate items on ComEd's computers, Strayer found, in examining the emails of the Dispatchers whom O'Malley did name, an email containing a pornographic web link that had been sent to two of those employees (Thomas Paulson and Richard Stachowicz) by Mr. Zelenika. Accordingly, Strayer obtained and examined the contents of Zelenika's ComEd email mailbox, which among other things confirmed that Zelenika had sent that inappropriate item over ComEd's email system to Stachowicz's and Paulson's ComEd email mailboxes. Strayer Aff., ¶ 15.

40. As Strayer was obtaining and examining the emails of all the ComEd employees who were named by O'Malley, or who (like Zelenika) were found to be implicated in the exchange of offensive emails with those whom O'Malley had named, Strayer classified all inappropriate items found among the employees' emails according to criteria similar to criteria that Strayer understood Exelon had used in a 2003 investigation of employee email usage elsewhere in the Company. The classifications that Strayer thus developed for this case, in order from least to most egregious, were: "Level 1" – content of an inappropriate but not sexually or

socially offensive nature; "Level 2" – content of an offensive nature but not involving sex acts or full frontal nudity; and "Level 3" – content including depictions of sex acts or full frontal nudity. Strayer then recorded the numbers of items of each such category found in each individual's ComEd emails. Strayer Aff., ¶ 12. Also see Deposition of Michael Latino ("Latino dep.") at 48-50; McGuire dep. at 40.

41. In analyzing the materials she found among the employees' emails, Strayer also noted, as to each inappropriate item found, whether the employee (again, in ascending order of egregiousness): (1) had received but deleted the item; (2) had received and saved the item; or (3) had forwarded the item to someone else over ComEd's email system. Strayer Aff., ¶ 13.

42. In reviewing Plaintiff Zelenika's emails that were downloaded from ComEd's email server in the investigation, Strayer found that among other things, Zelenika had forwarded an email containing a web link to a streaming video which showed a female "stripper/magician" removing her clothes while she repeatedly made a handkerchief disappear and reappear. By the conclusion of the video, the stripper was completely nude, facing the camera, while she appeared to extract the handkerchief from her vagina. Strayer Aff., ¶¶ 15-16; Latino dep. at 76-77. Strayer classified the video as in the most egregious content category ("Level 3") and found that Zelenika had forwarded the video link over ComEd's email system to his fellow ComEd Dispatchers, Richard Stachowicz and Thomas Paulson, at their ComEd email addresses. Strayer Aff., ¶ 16.

43. In November 2006, after performing the analyses described above, Strayer completed a "matrix" document listing each employee who had been found with inappropriate content on his/her ComEd email account or internet access records. Strayer's document indicated the number of inappropriate items by category found for each individual, and indicated

whether the individual had merely viewed the inappropriate items or had also sent them to other email addresses inside or outside ComEd. (A copy of Strayer's matrix is Exhibit D to Strayer's affidavit.) Applying the above distinctions, Strayer then indicated in the matrix what, if any, discipline she felt each such employee should receive, ranging from a performance counseling or disciplinary warning up to discharge. Strayer Aff., ¶ 17 and Aff. Exh. D. Strayer developed her recommendations as to the appropriate discipline to be administered in consultation with Exelon's Human Resources and Law Departments, concluding among other things that any employee found to have forwarded one or more "level 3" item within ComEd should be discharged. Strayer Aff., ¶ 14; Latino dep. at 90-91.

44. Strayer's matrix document (Strayer Aff. Exhibit D) recommended that four employees be discharged as a result of her investigation, because each of those four (and only those four) had been found to have forwarded to others within ComEd at least one item of "Level 3" content (images involving sex acts or full frontal nudity) over ComEd's electronic assets. The employees whom the document recommended be discharged were Zelenika, two other Dispatchers (Stachowicz and Paulson), and a ComEd Construction Supervisor. Applying the criteria described above, Strayer also recommended that two additional employees (including Sean O'Malley) receive 10-day disciplinary suspensions, that five more employees receive warning letters, and that two more receive documented performance counselings. Strayer Aff., ¶¶ 17, 20-21 and Aff. Ex. D.

45. At the time she conducted this investigation and made these disciplinary recommendations, Strayer was not familiar with Zelenika or any of the other employees whose emails were investigated. Strayer did not know whether the subject employees were popular with or well regarded by their managers, or whether they ever had made complaints about

ComEd practices or policies. Strayer based her investigative document and its recommendations exclusively on the information disclosed in her investigation as outlined in the matrix document. Strayer Aff., ¶¶ 4, 18-19.

46.     Strayer's completed matrix document summarizing her investigation findings and making her disciplinary recommendations was shared with Exelon executives consisting of Timothy McGuire, Director of ComEd Operations; Vincent Ransom, the OCC's Operations Manager; Richard Landy, Exelon's Senior Vice President of Human Resource Operations; Michael Latino, Director of ComEd Human Resources; Patrick Hallihan, Senior Human Resources Generalist, and executives in Exelon's law department. McGuire dep. at 29-31, 37-38; Ransom dep. at 30-33; Hallihan dep. at 74. Ultimately, ComEd approved the disciplinary recommendations as set forth in the document without any modifications. Strayer Aff., ¶ 22; McGuire dep. at 45; Ransom dep. at 138.

47.     On November 14, 2006, ComEd's Ransom, Urban, Hallihan and Strayer met with each Dispatcher who was to be discharged, and informed those Dispatchers of their discharges. Strayer Aff., ¶ 23; Urban dep. at 11, 27; Hallihan dep. at 69-73; Zelenika dep. at 162.

## ZELENIKA LACKS EVIDENCE OF A RETALIATORY DISCHARGE

48.     Although Paragraph 41 of the Complaint alleges that Zelenika's circulation of offensive material using ComEd's email system was merely a pretext for his discharge, and that ComEd actually discharged him because he reported violations by ComEd of the meal break provisions of the Illinois One Day Rest in Seven Act ("ODRISA"), Zelenika admits that he does not actually recall a specific occasion on which he made a complaint that ComEd's meal break practices were unlawful. Although Paragraphs 37 and 39(a) of the Complaint allege that Zelenika phoned ComEd's Ethics Hotline regarding such a matter, Zelenika admits that he made

15

only one phone call to the Ethics Hotline, which call lasted only about two minutes, and during which Zelenika does not recall having said anything about ComEd's meal break practices for Dispatchers. Zelenika dep. at 30-38. Indeed, during that one brief Hotline call, Zelenika did not even give his name or indicate that he worked at the OCC. Zelenika dep. at 92.

49. ComEd's McGuire, Ransom and Hallihan were not aware of any complaint about meal breaks ever having been made by Zelenika. McGuire dep. at 56; Ransom dep. at 80-83; Hallihan dep. at 10-12.

50. Although Paragraph 37 of the Complaint suggests that Zelenika refused ComEd's attempts to have him violate ODRISA, Zelenika admits that he does not recall ever being asked by ComEd to violate ODRISA. Zelenika explained that the allegation in the Complaint about his "refusing" such a ComEd request actually involves his merely having declined to answer phone calls from ComEd when he suspected that the purpose of the calls was to ask him to come in to work an extra shift that he did not want to work. Zelenika dep. at 53-54.

51. Zelenika also says that several other ComEd Dispatchers besides him similarly complained to OCC supervisors about Dispatchers' not receiving uninterrupted meal breaks, yet none of those he identifies was included among the employees who were discharged with him in 2006. Complaint, ¶ 37; Zelenika dep. at 60-61. Plaintiff Raney, who was not fired, testified that Raney complained to OCC supervisors about Dispatchers not receiving uninterrupted meal breaks. Raney dep. at 216-20.

52. Although the Complaint alleges that ComEd's Ransom and Urban bore animus toward Zelenika because of Zelenika's alleged complaints to management, Ransom and Urban exercised no influence over Strayer's recommendation that Zelenika be discharged, or Strayer's recommendations that other Dispatchers be disciplined less severely or not at all. Strayer Aff.,

¶¶ 18-19; Ransom dep. at 44-46; Urban dep. at 32-33; McGuire dep. at 27-28, 60. If anything, Ransom told the decisionmakers that Zelenika was a valuable employee who had the potential to be promoted, but Ransom did not try to save Zelenika's or any of the other investigated employees' jobs. Ransom dep. at 140-41, 147-48. Strayer's disciplinary recommendations, which were adopted by ComEd management and carried out without any modifications or departures, were not influenced by any input from Ransom or Urban and were based exclusively on Strayer's findings in her investigation. Strayer Aff., ¶¶ 18-19.

53. Zelenika further admits that, at his discharge appeal hearing before the EDR peer review panel in his case. Zelenika did not tell the panel that he had been a "whistleblower" or that he felt that he had been discharged in retaliation for whistleblowing activity. Zelenika dep. at 191-97.

Respectfully submitted,

COMMONWEALTH EDISON

Date: November 30, 2011     By:     /s/  *J. Stuart Garbutt*
                                    One of its attorneys

J. Stuart Garbutt
Tamkin Anwar
Meckler Bulger Tilson Marick & Pearson LLP
123 North Wacker Drive, Suite 1800
Chicago, Illinois 60606
Tel:    312/474-7900
Fax:    312/474-7898

stuart.garbutt@mbtlaw.com
tamkin.anwar@mbtlaw.com

M:\12872\pleading\Summary Judgment\SJ-Stmt of Matl facts.doc

17