## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| STEVEN ZELENIKA, NICHOLAS | ) | |
| CAPORELLI, and CHARLES RANEY | ) | |
| | ) | |
| Plaintiffs, | ) | No. 09 CV 2946 |
| | ) | |
| v. | ) | Judge Pallmeyer |
| | ) | |
| COMMONWEALTH EDISON, AN | ) | Magistrate Judge Valdez |
| EXELON CORPORATION. | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFFS' RESPONSE TO DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

The Plaintiffs, by and through their attorneys, Hunt & Associates, P.C., now respond to

Defendant's Motion for Summary Judgment to Plaintiff's Fourth Amended Complaint and in

support state:

## I.
## INTRODUCTION

This case is replete with factual issues which preclude summary judgment for ComEd.

These issues include the nature of dispatchers' duties, the extent of their discretion or

independent judgment as well as issues on Zelenika's individual claims relating to whether

Plaintiff complained, and whether the decision-makers knew of Plaintiff's complaints.

### Dispatchers At ComEd

Plaintiffs are all former employees of Defendant Commonwealth Edison, an Exelon

Corporation ("ComEd") and all worked under a classification of: Load Dispatcher, Operating

Dispatcher, Senior Distribution System Dispatcher, or Distribution System Dispatcher I or II

(collectively "Dispatchers"). (Plaintiffs' Response to Defendants' Rule 56.1(b) Statement ¶¶ 4-

6)[1]  Defendants renamed Plaintiffs' job titles without changing Plaintiffs' job duties, qualifications or responsibilities.  (¶ 54) The only change made concurrent with Defendants' re-titling of Plaintiffs' positions was to discontinue paying one and one-half times or double time for hours worked in excess of forty in a workweek.  (¶ 57)  This change in compensation violated the Fair Labor Standards Act (29 U.S.C. § 201 *et seq.*) ("FLSA") and Illinois Minimum Wage Law 820 ILCS 105/4a ("IMWL"). (¶ 57)

All dispatchers perform essentially the same functions (albeit with different voltages) and work with field personnel to shift electrical loads across ComEd's power grid and distribution system pursuant to predetermined and established written "routines" and procedures.  (¶¶ 5, 20, 55-56) Dispatchers do not utilize "discretion" or "independent judgment" or decision-making as those terms are used in the FLSA. Dispatchers routinely worked more than forty (40) hours of work per week. (¶ 59) Defendants previously recognized Dispatchers were "non-exempt" employees and historically paid time and a half for overtime hours. (¶¶ 23, 57) But Defendants changed their payment practices and denied Plaintiffs the full value of their earned compensation.  (¶ 57) Plaintiffs were also required to work through meal breaks and statutory rest periods on a daily basis. (¶ 61). Plaintiffs are entitled to their earned overtime wages that have not yet been fully paid. Numerous issues of fact preclude Defendants' motion for summary judgment on Plaintiff's Count I and II claims.[2]

**Zelenika's Complaints And Termination**

Plaintiff Steven Zelenika became aware that the Defendants were engaging in numerous questionable safety practices that Plaintiff believed violated the law. (¶ 62) Zelenika contacted the Commonwealth Edison Ethics Hotline to complain about employees not receiving scheduled

---

[1] All "¶" references in this brief relate to Plaintiffs' Rule 56.1(b) Response, incorporated by reference herein.
[2] For the Court's convenience, Plaintiff has identified a number of the factual issues in this case as Exhibit 19 to Plaintiff's Response to Defendants' Rule 56.1 Fact statement.

breaks, in violation of the Illinois One Day Rest in Seven Act, 820 ILCS 140/3 ("ODRISA") and other safety concerns. (¶ 48)

Zelenika complained to his direct supervisors Rich Urban and Vince Ransom about a lack of meal breaks and rest periods, about dispatcher staffing issues, and numerous questionable and potentially hazardous safety practices, which could lead to Dispatcher fatigue and mistakes and which could imperil Dispatchers, field crews and the public at large. (¶¶ 48, 50, 51, 62) Ransom and Urban deny Plaintiff complained, creating an issue of fact. Zelenika was "more vocal" about these issues and was despised by his supervisors for continuously raising such complaints. (¶¶ 48, 49, 51, 62, 68) Shortly before his termination, Ransom confronted Zelenika and asked him why Zelenika always felt the need to defend other people or to speak up about safety issues. (¶¶ 51, 52, 66) Ransom made it clear to Zelenika that he was upset Zelenika repeatedly raised ODRISA and other safety. (*Id*.) Ransom denies, creating more fact issues.

In addition to raising safety, meal and staffing complaints, Zelenika also complained to Urban about rampant and ongoing abuse of Defendants' Use of Electronic Assets Policy. (¶¶ 29-32, 52, 65) Zelenika noticed others in the workplace frequently viewing and forwarding hardcore pornographic images and movies. Dispatchers would frequently gather around Brian Goetz's desk to view hardcore pornography, including acts of beastiality. (¶ 66) Urban and other supervisors were aware of or participated in this practice. (¶ 66) Yet, when Zelenika asked Urban if this was appropriate, Urban chastised Zelenika and told him "don't worry about it." (¶¶ 29-32, 52, 66) Thereafter, Ransom initiated an investigation regarding the same rampant and ongoing internet abuse which Zelenika had reported to Urban. (¶ 70) Ransom used the investigation to get rid of Zelenika in retaliation of his constant complaints. (¶ 69)

Ransom made sure to insulate supervisors from the internet investigation and told the supervisors that an investigation would be commencing. (¶ 88) Supervisors were given ample

3

time and forewarning to purge their hard drives and emails of inappropriate content. (¶ 88) Nevertheless, substantial pornographic and inappropriate emails were found to have been forwarded by numerous employees, including Brian Goetz and Doug Adams. (¶¶ 95-96) Zelenika had but one "Level 3" violation. (¶ 79) This was an email which was not pornographic and which Zelenika does not remember ever forwarding. (¶¶ 42, 81) Defendants did not investigate or interview Zelenika and others to discover whether Zelenika had actually sent this email. (¶ 83) Instead, Defendants summarily terminated Zelenika. (¶ 100) Yet, Defendants retained and even promoted dispatchers who committed far more and far worse violations of the Electronic Assets Policy. (¶ 96) ComEd Dispatchers uniformly recognized that ComEd used the email investigation as a pretextual vehicle to terminate Zelenika in retaliation against him for frequently complaining about ODRISA, safety and wage violations. (¶¶ 98-99)

## II.
## SUMMARY JUDGMENT STANDARD

Summary judgment is only proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In a motion for summary judgment, all facts, and any inferences to be drawn from them, must be viewed in the light most favorable to the non-moving party. *Wis. Cent. Ltd. v. Shannon*, 539 F.3d 751, 756 (7th Cir. 2008). The court does not assess the credibility of witnesses or weigh evidence, *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005), and will not grant summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986). Numerous questions of fact preclude summary judgment as to Plaintiff Zelenika's retaliatory discharge claim.

### III.
### ARGUMENT

### A. DEFENDANTS MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S FLSA AND IMWL CLAIMS SHOULD BE DENIED

The FLSA and IMWL require employers to pay overtime (time and a half) to employees working more than forty (40) hours in a workweek, unless the employer can prove they are exempt. *See* 29 U.S.C. § 207(a)(1); *Kennedy v. Commonwealth Edison Co.*, 410 F.3d 365, 369 (7th Cir. 2005); *Urnikis-Negro v. Am. Family Prop. Servs.*, 616 F.3d 665, 669 (7th Cir. 2010)(the IMWL tracks the FLSA and applies the same exemptions), citing 820 ILCS 105/4a; *Robinson v. Tellabs, Inc.*, 391 Ill. App. 3d 60, 65, 907 N.E.2d 501(1st Dist. 2005). The FLSA presumes employees are non-exempt. *See e.g.*, *Corning Glass Works v. Brennan*, 417 U.S. 188, 196-97, 94 S. Ct. 2223 (1974). The burden is on an employer to show that an employee is exempt for any reason. *Id.* ComEd fails to meet that burden.

Defendants raised several Affirmative Defenses to Plaintiff's Fourth Amended Complaint, including the Administrative and/or the Executive exemptions to the FLSA. Defendants do not move for summary judgment based on the Executive exemption. Defendants cannot sustain their burden of proving the applicability of the Administrative exemption, and never plead the "Highly Compensated" exemption. Summary judgment should be denied.

### 1. ComEd May Not Invoke The FLSA Because It Docks Employees' Pay For Absences Shorter Than One Day

The DOL's Regulations provided in part:

> An employer who makes improper deductions from salary shall lose the exemption if the facts demonstrate that the employer did not intend to pay employees on a salary basis. An actual practice of making improper deductions demonstrates that the employer did not intend to pay employees on a salary basis. The factors to consider when determining whether an employer has an actual practice of making improper deductions include, but are not limited to: the number of improper deductions, particularly as compared to the number of employee infractions warranting discipline; the time period during which the

> employer made improper deductions; the number and geographic location of employees whose salary was improperly reduced; the number and geographic location of managers responsible for taking the improper deductions; and whether the employer has a clearly communicated policy permitting or prohibiting improper deductions.

29 C.F.R. § 541.603(a) (2009). If an employer has a policy of reducing an employee's compensation for fractions of days that the employee is absent from work, then the employer may not invoke the exemption from the Fair Labor Standards Act with regard to that employee. *Kennedy*, 410 F.3d 365; *see also, Klein v. Rush-Presbyterian-St. Luke's Med. Ctr.*, 990 F.2d 279, 284 (7th Cit. 1993). "This requirement, commonly referred to as the 'no-docking rule' prohibits employers from deducting an employee's pay based on partial day absences" and certain other forbidden reasons. *Whetsel v. Network Prop. Servs.*, 246 F.3d 897, 900 (7th Cir. 2001).

Being "subject to" a reduction in pay for missed work is sufficient to prevent an employee from being considered "salaried." *Kennedy*, 410 F.3d at 371. The phrase "subject to" does not require proof that an employer has reduced an employee's wages; an employment policy that creates a significant likelihood of a deduction will suffice. *Id.* at 371.

Defendants' witnesses testified that that if a dispatcher was out of vacation, sick time or personal time and missed a day of work, that employee would be "4x'd" (entered for time off without pay) a "majority of the time." (¶ 108) Defendants' Vice President admits 4x time can be issued against employees who miss work. (¶ 109) Dispatchers understood that if they arrived late and did not "make up" their time that they could be "4x'd" or "docked." (¶ 106) A question of fact exists precluding summary judgment as to whether Defendants truly paid employees on a salaried basis and whether Dispatchers were "subject to" a reduction in pay for missed work.

## 2. The "Highly Compensated" Affirmative Defense Was Not Plead

ComEd has plead only two exemptions—the "executive" exemption and the "administrative" exemption—neither of which applies. It never plead the "Highly Compensated"

defense. As such, that defense is waived and Defendants' summary judgment motion should be denied. *Kaczmarek v. Rednour*, 627 F.3d 586, 592 (7th Cir. 2010)(a party must plead affirmative defenses in its answer to properly preserve them). If ComEd is to prevail on its Second Affirmative Defense, it bears the burden of proving that Plaintiffs fit squarely within those exemptions. ComEd has not plead the "Highly Compensated" affirmative defense and cannot now raise this for the first time at summary judgment.

Defendants' Second Affirmative Defense does not provide notice to Plaintiffs that Defendants intended to raise the Highly Compensated affirmative defense to this matter. Plaintiffs amended their Complaint four times. At each step, Defendants moved to dismiss based on Plaintiff's alleged insufficiency to adequately give the Defendants' notice of Plaintiffs' claims based on the pleading standards established in *Twombly* and *Iqbal*. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937 (2009). Now, despite never pleading the "Highly Compensated" affirmative defense at anytime, Defendants seek summary judgment based on this affirmative defense.

Fed. R. Civ. P. 8(c) requires a defendant to raise affirmative defenses in the pleadings, and a defendants' failure to do so constitutes a waiver of that defense where it is prejudices the plaintiff. *See Patton v. Chicago Heights*, 2010 U.S. Dist. LEXIS 44646, *4, fn. 1 (N.D. Ill. 2010)(Cole, M.J.). The *Iqbal/Twombly* pleading standards apply to affirmative defenses as much as a complaint. *See e.g., Cassetica Software, Inc. v. Computer Sciences Corp.*, 2011 U.S. Dist. LEXIS 108646, at *5 (N.D. Ill. 2011)(Leinenweber, D.J.)(District Courts in the Seventh Circuit apply *Twombly* and *Iqbal* standards to affirmative defenses). The several exemptions are each considered separate and distinct Affirmative Defenses with their own unique elements and criteria. *See Schaefer-Larose v. Eli Lilly & Co.*, 663 F. Supp. 2d 674 (S.D. Ind. 2009) (analyzing the Administrative and Highly Compensated exemptions as separate affirmative defenses).

Defendants did not provide notice that they intended on raising the Highly Compensated affirmative defense at any prior stage of this proceeding, in spite of ample opportunity to do so. Defendants' Affirmative Defenses as plead do not comply with Rule 8(c) under *Iqbal/Twombly* standards. Plaintiffs have been prejudiced in that they would have sought additional information and testimony from Defendants in discovery had they been on notice of this separate affirmative defense. Defendants' blatant Rule 8(c) violation would be highly prejudicial to Plaintiffs if Defendants are allowed to raise a new affirmative defense for the first time at the summary judgment stage after all discovery has been completed. This argument should be stricken and Defendants' motion should be denied on this point.

### 3. The "Highly Compensated" Exemption Does Not Apply

The "highly compensated" exemption renders an employee exempt from overtime when the employee 1) is paid at least $455/week on a salary or fee basis; 2) receives at least $100,000 per year in total compensation; and, 3) "customarily and regularly performs any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee." 29 C.F.R. § 541.601.

Employees who perform jobs such as electricians, operating engineers, and computer operators are not exempt under this section no matter how highly paid they might be. 29 C.F.R. 541.601(d); *see also* United States Department of Labor, FLSA Security Advisor, at http://www.dol.gov/elaws/ esa/flsa/overtime/ jobs.htm, last visited Dec. 18, 2011). As this Court is aware, the DOL statutory construction and interpretation is entitled to considerable deference. *Sehie v. City of Aurora*, 2003 U.S. Dist. LEXIS 13051 (N.D. Ill. 2003)(Kennelly, D.J.), *aff'd by* 432 F.3d 749 (7th Cir. 2005)(finding a "911 dispatcher" was entitled to overtime compensation).

Dispatchers' central duties include those of electricians, operating engineers and computer operators or data entry clerks. (¶¶ 13, 55) Dispatchers are electricians whose

central duties included following established routines and procedures to collaborate with Overhead Electricians and other field personnel to help repair and modify electrical lines and equipment. (¶¶ 13, 55) Dispatchers also performed computer operator-type duties, including reading from and entering data into ComEd's "SCADA system" to assist the field crew which cannot view the SCADA system while in the field. (¶¶ 13, 20, 55) As Dispatchers are electricians, operating engineers and computer operators, the Highly Compensated exemption does not apply. Defendants' motion for summary judgment should be denied.

### i. Dispatchers Did Not Regularly Make Over $100,000

Defendants argue that a $100,000 income bars a Dispatcher from recovering for wages which are due and owing.  But the evidence shows that many Dispatchers did not make $100,000 per year during one or more years in which they seek overtime repayments. (¶¶ 28, 83) Plaintiffs were paid straight-time for overtime hours, and only some Dispatchers received more than $100,000 in a one-year period. (¶¶ 27, 28, 57, 103) Even when Dispatchers' compensation eclipsed the $100,000 level, it did so only because ComEd paid an illegal rate for overtime hours worked. (¶¶ 28, 103) ComEd concedes in depositions that it did not pay Dispatchers at a $100,000 level, but that Dispatchers were paid straight-time for overtime based on "hours worked" – regardless of their salary and income level. (¶¶ 57, 59)

Total annual compensation may include salary, as well as commission payments, nondiscretionary bonuses, and other nondiscretionary compensation. 29 C.F.R. § 541.601(b)(1). But nothing provides that overtime payments paid at an improper rate may also be allowed in order to get an employee to an exempt level. Defendants' theory would allow them to require employees to work tremendous amounts of overtime at a straight-time rate, just so those employees barely make the minimum threshold for an exemption. Allowing Defendants to engage in this practice would reward Defendants for forcing would-be non-exempt employees to

work so many overtime hours that the employees become disenfranchised from their statutory rights to one-and-one-half times their hourly wage for overtime worked.

The "Highly Compensated" exemption does not apply to individual Dispatchers such as David Kariman, who did not make $100,000 per year. (¶ 28) Defendants have offered no evidence that each of the Plaintiffs made more than $100,000 and Plaintiff's evidence shows that some did not. (¶¶ 28, 103) A question of fact exists as to which Plaintiffs, if any, made more than $100,000 in any relevant year. Defendants cannot satisfy their burden at summary judgment that the Highly Compensated exemption applies. Defendants' motion should be denied.

### ii. Dispatchers Did Not Perform Duties Of An Administrative Employee

To qualify for the Highly Compensated exemption, Defendants also must prove that Plaintiffs routinely performed one or more of the duties of an exempt administrative, executive or professional employee. 29 C.F.R. § 541.601(a); *see e.g.*, *Zubair v. Entech Eng'g P.C.*, 2011 U.S. Dist. LEXIS 93866, at 14-15 (S.D.N.Y. 2011). ComEd cannot do this. The Administrative Exemption includes employees who perform office or non-manual work directly related to the management or general business operations of the employer or the employer's customers and whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance. 29 C.F.R §541.200.

### iii. Dispatchers Did Not Exercise Independent Judgment

Section 541.202 of the DOL Regulations defines the level of "discretion and independent judgment" required for the Administrative Exemption:

> "discretion and independent judgment" must be applied in the light of all the facts involved in the particular employment situation in which the question arises. Factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance include, but are not limited to: *whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices*; whether the employee

carries out major assignments in conducting the operations of the business; whether an employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to the operation of a particular segment of the business; *whether the employee has the authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters*; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significant on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

29 C.F.R §541.202 (emphasis added). The exercise of discretion and independent judgment requires that the employee has authority to make an independent choice, free from immediate direction or supervision - more than the "use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." 29 C.F.R §541.202(e).

Dispatchers work with field personnel make sure all involved understand the step-by-step "routines" for repairing or maintaining systems or equipment. (¶¶ 13, 55) The carefully written and peer-reviewed routines and standard operating procedures which Dispatchers are required to follow are not created by Dispatchers, but by Arrangers and Senior Arrangers. (¶ 17, 20) Dispatchers never had authority to create or implement operating procedures. (¶ 17, 20, 60, 104) Dispatchers never had the authority to deviate from established ComEd procedures. (¶¶ 18, 56, 60, 104) When a Dispatcher and field worker have a difference of opinion on what should be done regarding the maintenance or repair to be performed, and they are unable to resolve their disagreement, the Dispatcher is expected to involve a Shift Manager and the field personnel is supposed to involve his supervisor. (¶¶ 17, 60)

While Bob Pinto provides an affidavit testifying to Dispatcher job descriptions, the actual practice is that Dispatchers do not use independent discretion or judgment in

performing their jobs. ComEd supervisors acknowledged at deposition that Dispatchers cannot hire, terminate or discipline other employees. . (¶ 104) Dispatchers cannot grant or deny benefits to another employee. (¶ 104) Dispatchers do not have the authority to negotiate or make contracts for or to formulate policies for ComEd.  (¶ 104) Dispatchers cannot even set their own hours. (¶ 104)

ComEd has also acknowledged that Dispatchers do not have any employees report to them directly, do not direct the activities of two or more employees, and cannot compel field workers to undertake actions or to stay late to perform work. (¶¶ 5, 105) Even when Dispatchers collaborate with field personnel, ComEd's policy is that it is almost always a 1-person crew in the field. (¶105) Dispatchers do not have the authority to tell other employees when or how to do their work. (¶105) Pinto's affidavit and Defendants' argument to the contrary on these points is not credible in light of the evidence. At worst, there is a question of fact regarding whether Dispatchers ever performed one or more duties of an administrative employee.

There is no un-contradicted evidence that Dispatchers exercised independent decision-making. ComEd asserts that Dispatchers became exempt employees after changes in title were made. But routines and procedures were considered "high-level guidance" to be followed even in emergency situations.  (¶¶ 18, 56) Dispatchers actually lost discretion as more written routines and standard operating procedures were implemented subsequent to the title and overtime rate changes. (¶ 60)  Moreover, there are significant factual disputes regarding this issue.

Dispatchers' principal function is to collaborate with field crews to perform maintenance and repairs. (¶ 55) Dispatchers did not "oversee" and "direct" field crews. (¶¶ 5, 13, 15, 55) Instead, Dispatchers and field personnel worked together to make necessary repairs and maintenance. (¶¶ 13, 55) Dispatchers did not perform duties that subjects them to the Administrative Exemption.

12

### 4.   **Named Plaintiffs Are Not Required To File Written Consents**

Defendants argue that the named Plaintiffs are barred from participating in Count I because they did not file consents to participate in the FLSA claims aside from the Complaint. Defendants assert that 29 U.S.C. § 216(b) requires a needless act to be performed - that a named Plaintiff who seeks to bring a collective action on behalf of himself and others must file a separate consent to bring the action. Defendants' only citation in support of this point is from a Tennessee court and is contradicted by other persuasive authority out of both that Circuit and in this Circuit as well. *Schwertfeger v. Village of Sauk Village*, 2000 U.S. Dist. LEXIS 1912, at *1 (N.D. Ill. 2000)(Plunkett, D.J.)("the plaintiff who filed this suit, did not file a consent, but he was not required to do so"); *Gordon v. Trace Ambulance, Inc.*, 2001 U.S. Dist. LEXIS 3140, at *2 (N.D. Ill. 2001)(Coar, D.J.)([Section 216(b)] requires that individuals not named in the complaint file written consent forms to become party plaintiffs."); *see e.g.*, *Lowery v. Greater Chattanooga Pub. TV Corp.*, 2008 U.S. Dist. LEXIS 6711 (E.D. Tenn. 2008)(allowing named parties to proceed with an FLSA case). "The requirement that plaintiffs in a representative action file a written consent with the district court applies only to those parties who are not named as plaintiffs in the complaint." *Anderson v. Montgomery Ward & Co.*, 852 F.2d 1008, 1018-19 (7th Cir. 1988), citing *Allen v. Atlantic Richfield Co.*, 724 F.2d 1131, 1135 (5th Cir. 1984) (holding that the FLSA "does not require additional time-and-resource-consuming filings.").

Defendants suggest that the opt-in Plaintiffs are not properly parties for purposes of Count II because they did not move to certify a class for their IMWL claims.  However, Plaintiffs have moved to certify a class and this motion is currently pending before the Court. Defendants' motion on this point is premature and inappropriate for summary judgment. Defendants' motion should be denied.

### B. NUMEROUS QUESTIONS OF FACT PRECLUDE SUMMARY JUDGMENT ON ZELENIKA'S RETALIATORY DISCHARGE CLAIM

Retaliatory discharge claim requires that a plaintiff show he was "(1) discharged, (2) in retaliation for his activities; and (3) that the discharge violated a clear mandate of public policy." *Brandon v. Anesthesia & Pain Mgt. Assoc., Ltd.,* 277 F.3d 936, 940-41 (7th Cir. 2002); *Kelsay v. Motorola, Inc.*, 74 Ill.2d 172, 181, 384 N.E.2d 353, 357 (1978). The requirement that a Plaintiff show he was discharged in retaliation for his protected activities merely requires that plaintiff show a causal relationship between his activities and the discharge. *Dixon Distributing Co. v. Hanover Ins. Co.,* 161 Ill.2d 433, 443, 641 N.E.2d 395, 400 (1994). The discharge must have be causally related to [the protected activity]. *Id.* Internal reporting satisfies a retaliatory discharge claim. *Callahan v. Edgewater,* 374 Ill. App. 3d 630, 632, 872 N.E.2d 551, 552 (1st Dist. 2007). "Summary judgment should be used sparingly" where the material fact at issue is the defendant's motivation. *See, e.g., Dister v. Cont'l Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir. 1998).

Many questions of fact exist regarding Defendants' intent in light of the suspicious timing and circumstances of Plaintiff's termination. Plaintiff complained on a daily basis about ODRISA violations and other safety issues at work. (¶¶ 48, 50, 61, 62) Plaintiff believed it was illegal that employees were refused a chance to take intermittent breaks or meal breaks. (¶ 48) There is uncontroverted evidence that Dispatchers were not allowed meal breaks and were frequently required to work as much or more than twelve hours without a meal break. (¶¶ 49, 50, 61, 62) Zelenika complained about these issues throughout 2006, prompting Urban to threaten terminating Zelenika for complaining (¶ 64) and prompting Ransom to pull Zelenika aside and criticize Zelenika stating "why do you always have to stick up for everyone?" (¶ 65) Months later, Ransom and Urban fired Zelenika. (¶ 100)

14

### 1.  **The Investigation Was Flawed**

Defendants' Motion states that Defendants terminated Zelenika "after an impartial and thorough investigation." But Defendants did not investigate rampant internet abuse when Zelenika first raised concerns about the problem to Urban. (¶¶ 29-32, 52, 65) This abuse was not investigated until Sean O'Malley reported misconduct in the OCC - and Zelenika was not named in O'Malley's complaint. (¶ 39) O'Malley complained to be a whistleblower himself because he was being criticized for poor performance at work. (¶ 34) Before initiating the investigation, Ransom tipped off shift managers that it was coming, giving them time to purge their hard drives and eliminate improper emails. (¶¶ 88-89) Then Defendants quickly targeted Zelenika for a violation of the policy, claiming he forwarded a "Level 3" email containing pornography. (¶ 39)

### i. **The Investigation Was Not Based On Written Standards**

Strayer failed to define content per a "level 1", "level 2" or "level 3" basis and cannot state a definition for what constituted "pornography" for purposes of her investigation. (¶¶ 40-44; 76) Strayer used others to assist her in reviewing emails, but never gave those persons written or uniform instructions as to what constituted a Level 1, 2, or 3 violation. (¶ 74) McGuire, one of the highest ranking employees involved in the investigation, testified that sending inappropriate emails from a company email address to an email address outside the company constituted the most egregious form of email abuse. (¶ 77) Strayer did not provide written standards to those involved in the investigation or the decision to terminate.  Strayer says she relied on criteria similar that used in a 2003 investigation of employee email usage elsewhere in the Company. However, Defendants only have two barely-legible pages of documentation from that investigation, and those documents do not indicate what constitutes a "Level 1, 2 or 3" violation.  (¶¶ 40-44; 76)

### ii.  The Investigation Treated Similarly Situated Employees More Favorably Than Zelenika

The result of the investigation was that a single email was found to have been forwarded from Zelenika's account, whereas other similarly situated employees forwarded much more obscene material on multiple occasions outside the company. (¶¶ 79, 96-97) In an absence of any written criteria for a terminable offense, Tim McGuire said that sending inappropriate emails from a company email address outside the company was more severe than sending an email internally. (¶¶ 40, 70)

Zelenika had not viewed the video link contained in the email to know its content, cannot recall ever forwarding it to anyone, and the lead investigator, Strayer, admits it could have been sent by another employee using Zelenika's computer. (¶¶ 39, 71)  Strayer did not interview Zelenika or conduct an investigation into his statements outside of his termination meeting. (¶ 71)  Strayer classified Zelenika's email as "pornographic" and a "Level 3" offense – both arbitrary terms which Strayer admits were not given any substantive definitions in the course of her investigation. (¶ 69) Further, several other dispatchers, including Brian Goetz and Doug Adams were found to have three and four "Level 3" violations respectively, including content far more graphic than Zelenika's purported emailed link, yet they were not terminated. (¶¶ 77-79) In fact, Goetz was later promoted. (¶ 78) The investigation did not seek the identity of ComEd workers who forwarded inappropriate content from their home email accounts while at work in spite of evidence showing that such a practice went on. (¶ 76)

Defendants' excuse for terminating Plaintiff – zero tolerance for his activity - is inconsistent with the discipline given to other employees. Under the circumstances, there is a question of fact whether Zelenika's complaints were the true motivation behind his termination.

**IV.**
**<u>CONCLUSION</u>**

WHEREFORE, Plaintiffs respectfully request that the Court deny Defendants' Motion

for Summary Judgment, and grant all relief this Court deems just and equitable.


Respectfully submitted,

By: <u>/s/ Keith L. Hunt (electronically filed)</u>
Keith L. Hunt, Attorney for Plaintiff

Keith L. Hunt
Hunt & Associates, PC
Three First National Plaza, 2100
Suite 2100
Chicago, Illinois 60602
(312) 558-1300

17

**CERTIFICATE OF SERVICE**

I, Keith Hunt, certify that I caused a copy of the foregoing Plaintiff's Response to

Defendants' Motion for Summary Judgment was filed and served electronically through the

Court's CM/ECF Electronic Filing System and associated e-mail system on all counsel of record

on December 23, 2011.

J. Stuart Garbutt at stuart.garbutt@mbtlaw.com
Naureen Amjad at naureen.amjad@mbtlaw.com
Meckler Bulger Tilson Marick & Pearson LLP
123 North Wacker Drive, Suite 1800
Chicago, Illinois 60606

By: */s/* Keith L. Hunt *electronically filed*
    Keith L. Hunt