**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **STEVEN ZELENIKA, NICHOLAS CAPORELLI, and CHARLES RANEY** | ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **No. 09 C 2946** |
| **COMMONWEALTH EDISON CO.** | ) ) ) | **Hon. Rebecca R. Pallmeyer** |
| **Defendant.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiffs bring this action against their former employer, Commonwealth Edison Co. (the "Defendant" or "ComEd"), to recover overtime under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207, and the Illinois Minimum Wage Law ("IMWL"), 820 ILCS 105/4a. Plaintiffs worked as Senior Distribution System Dispatchers, a position that involved monitoring and addressing problems with ComEd's electrical distribution system. Monitoring the system from desks at a central facility in Joliet, Illinois, ComEd Dispatchers' responsibilities included communicating with field crews making scheduled and emergency repairs to ComEd's grid, directing the crews through repair procedures (including safety protocols for energizing and de-energizing equipment), and entering information received from the field crew into ComEd's computer system. Plaintiffs claim that they were non-exempt employees and that ComEd violated FLSA and IMWL by paying Plaintiffs at a straight-time rate for overtime work. Defendant maintains that Plaintiffs are highly compensated employees who fall within the administrative and executive exemptions to the overtime requirements.

Plaintiffs filed this case in the Circuit Court of Cook County; ComEd removed the action to this court on May 14, 2009. (Notice of Removal [1].) Plaintiffs bring their FLSA claim as a representative action, on their own behalf and on behalf of five other former ComEd Dispatchers who filed notice with this court on October 20, 2010 (the "Opt-In Plaintiffs"). Plaintiffs have also

moved to certify a class action for their state law cause of action, but that motion is not yet fully briefed. Additionally, Plaintiff Zelenika brings a retaliatory discharge claim on his own behalf only, alleging that ComEd terminated his employment in retaliation for his objections to ComEd's alleged policy of requiring Dispatchers to take meal breaks at their desks, in violation of the Illinois "One Day Rest in Seven" Act, 820 ILCS 140/3.[1]  In its defense, ComEd asserts that Zelenika's discharge was the result of an investigation into the distribution of pornographic images through ComEd's e-mail system by several employees, including Zelenika.

The parties have filed cross-motions for summary judgment.  For the reasons explained below, Defendant's motion is granted with respect to Plaintiffs' FLSA claim (Count I) and Zelenika's retaliatory discharge claim (Count V).  The court concludes that material disputes of fact preclude summary judgment on Plaintiffs' IMWL claim (Count II), however, and elects to retain jurisdiction over that claim.

## BACKGROUND

### I.     ComEd Dispatcher Positions

According to its website, Defendant ComEd, a corporate subsidiary of Exelon Corporation, delivers electricity to approximately 3.8 million customers across Northern Illinois.  ComEd, *Company Profile*, https://www.comed.com/about-us/company-information/Pages/profile.aspx (last visited July 19, 2012).  Until their termination or resignation, ComEd employed Steven Zelenika, Nicholas Carporelli, and Charles Raney (the "Plaintiffs" or "Named Plaintiffs") as Senior Distribution

---

[1]     The Fourth Amended Complaint contained two other counts related to Zelenika's termination, which this court dismissed in previous rulings.  On September 19, 2009, this court dismissed Count IV, a state law retaliatory discharge claim predicated on Zelenika's union involvement, as preempted by the National Labor Relations Act.  (Minute Order [25].)  On June 9, 2010, this court also dismissed Zelenika's Illinois Whistleblower Act claim (Count III) because Zelenika does not allege that he reported any safety or other violations of Illinois law to anyone outside of ComEd.  (Minute Order [54].)

System Dispatchers at its Operations Control Center ("OCC") in Joliet, Illinois. (ComEd's LR 56.1(a)(3) Statement of Material Facts (hereinafter "Def.'s 56.1") ¶ 6.)

Plaintiffs' job title changed several times during the course of their employment. Originally, Dispatchers were classified as either "Load Dispatcher," whose responsibilities included working with higher voltage equipment such as those found in substations, or "Operating Dispatcher," who worked with lower voltage lines outside of substations. (Pls.' Rule 56.1(a)(3) Statement of Undisputed Material Facts (hereinafter "Pls.' 56.1") ¶¶ 6-7.) At some point during or after 2000, these titles were changed to "Senior Dispatcher" and "Dispatcher," respectively, and later changed again to "Senior Distribution System Dispatcher" and "Distribution System Dispatcher II." (Pls.' 56.1 ¶ 6.) Around the time of this latest change in titles, ComEd also created the position of "Distribution System Dispatcher I," which entails fewer responsibilities and requires less experience than Distribution System Dispatcher II, but similarly involves work on lower voltage lines. (Dist Sys Dispatcher II Position Description, Ex. A-2 to Pinto Aff., App. 1 to Def.'s 56.1; Dist Sys Dispatcher I Position Description, Ex. A-3 to Pinto Aff.)

Though all Named Plaintiffs held the position of Senior Distribution System Dispatcher, several of the Opt-In Plaintiffs held Distribution System Dispatcher I or II positions. (Def.'s 56.1 ¶ 6.) Notably, one of those Opt-In Plaintiffs, Julian Smith, held the position of Distribution System Dispatcher II, and has been deposed in this litigation. (*Id.*) The remaining Opt-In Plaintiffs have agreed to be bound by the testimony and evidence submitted by the Named Plaintiffs and Opt-In Plaintiff Smith. (*Id.* ¶ 8.)

### A.    Dispatcher Responsibilities and Duties

Although their titles may have changed, Dispatchers' duties remained the same. Regardless of specific job title, Dispatchers monitor ComEd's power distribution system, oversee service to the system, and respond to customer complaints and power outages. (Def.'s 56.1 ¶ 12.)

ComEd's distribution system is divided into four regions with at least one Dispatcher working at the desk for each region. (*Id.* ¶ 13.) In exercising their duties, Dispatchers share responsibility for the reliability of ComEd's electrical services and the safety of ComEd's equipment, the field crews they work with to complete repairs, and the public. (*Id.* ¶ 20.) Consequently, Dispatchers must be highly skilled employees. ComEd requires its new Dispatchers to complete four months of classroom training, followed by on-the-job shadowing of experienced Dispatchers, before they are assigned to work on their own. (*Id.* ¶ 21.)

From their desks in the OCC, Dispatchers monitor ComEd's electrical distribution system and adjust voltages on the system using computer displays, alarm systems, maps, and controls. (*Id.* ¶ 5.) Dispatchers also receive notifications of power outages or other emergency situations directly from customers. (*Id.* ¶ 14.) Their duties include documenting changes in the distribution system such as system outages. (Pls.' 56.1 ¶ 32.) Most important to the present litigation, Dispatchers are also responsible for communicating with field crews to help resolve problems and complete repairs to the system. (*Id.* ¶ 12; Def.'s 56.1 ¶ 11.)

Some problems with the electrical grid are fixed through scheduled maintenance. In these cases, ComEd employees known as "Arrangers" prepare a "switching routine," a step-by-step procedure to deenergize equipment needing repair and to redirect power in the interim. (Def.'s 56.1 ¶ 17.) To ensure that the field personnel understand the switching routine, ComEd protocol requires a process called "three way communication," in which the Dispatcher reads the step-by-step routine to the field personnel, who then must repeat back each step to the Dispatcher. (Pls.' 56.1 ¶¶ 15-16.) Through this process, the Dispatcher ensures that the field conditions observed by the field crew match the specifications in the routine and the information contained in the computer system that the Dispatcher monitors. (*Id.* ¶ 17.) As field personnel complete the work, they "check-off" steps by reading them back to the Dispatcher. (*Id.* ¶ 24.)

In emergency, or "emergent," situations, such as a power outage, unplanned repairs are required. It is not clear from the record in this case how often unplanned outages occur in any given segment of the grid, but Opt-In Plaintiff Smith testified that the number across the entire ComEd distribution system could be as high as 150 in a given day (Smith Dep., Ex. 4 to Pls.' Local Rule 56.1(b)(3) Resp. to Def.'s 56.1 (hereinafter "Pls.' 56.1 Resp."), at 104), and Plaintiff Raney admitted that unplanned outages were a frequent occurrence. (Raney Dep., Ex. 2 to Pls.' 56.1 Resp., at 173.) Brian Goetz, a Shift Manager who previously held positions as an Operating Dispatcher and Load Dispatcher, testified that when he worked as a Load Dispatcher, approximately twenty percent of his time was devoted to dealing with emergency situations. (Goetz Dep., Ex. 5 to Pls.' 56.1 Resp., at 28.) In these situations, Dispatchers and field personnel had to complete repairs without the benefit of a switching routine designed ahead of time by an Arranger. (Caporelli Dep., Ex. 3 to Pls.' 56.1 Resp., at 104-05; Raney Dep. at 151-153; Smith Dep. at 105.)

For either scheduled maintenance or emergency repairs, work could not proceed if the Dispatcher or the field personnel disagreed on the appropriate steps to carry out the repair safely and effectively. (Def.'s 56.1 ¶ 17; Pls.' 56.1 ¶ 18.) In rare cases where the Dispatcher and the field personnel could not resolve a dispute, ComEd directed Dispatchers to involve a supervisor, referred to as a "Shift Manager," who would resolve the dispute by speaking with the field crew supervisor. (Peretti Dep., Ex. 6 to Pls.' 56.1 Resp., at 55-56.)

The parties disagree about how much discretion or independent judgment Dispatchers exercised in helping to create switching routines for emergent situations. Defendant asserts that in an emergency, Dispatchers were expected to help "design a switching route 'on the fly' to isolate faulty equipment, make the necessary repairs, and restore power." (Def.'s 56.1 ¶ 18.) Given the number of unique situations that could arise in the field, Defendant maintains that there could not possibly be established procedures for every contingency. According to the testimony of Robert Pinto, a former Shift Manager and current Operations Manager of the OCC, written procedures

"only provide high level guidance. [Dispatchers] use that guidance and then provide their own judgment associated with whatever unique scenario there is in the field." (Pinto Dep., Ex. 10 to Pls.' 56.1 Resp., at 91.) Furthermore, Gerald Peretti, a former Dispatcher and current Shift Manager, testified that in emergency outage situations, Dispatchers were free to implement switching routines without any supervisor review. (Peretti Dep. at 48.) Peretti further testified that in emergent situations, where unplanned work was needed to prevent an outage, Dispatchers were expected to peer review one another's switcher routines. (*Id.*)

Plaintiffs note that even in emergency situations, ComEd stressed the importance of following procedures. According to Plaintiffs' testimony, ComEd has developed written standard operating procedures for many repairs and other facets of a Dispatcher's work—procedures, for example, on how to take equipment out of service and how to restore it to service. (Zelenika Dep., Ex. 1 to Pls.' 56.1 Resp., at 288-90; Raney Dep. at 270-73; Caporelli Dep. at 106.) Operations Manager Pinto acknowledged that there are more written procedures today than when he was a Dispatcher from 1998 until 2003. (Pinto Dep. at 9-13, 91.) Shift Manager Goetz testified that ComEd has established three levels of procedures: Level I procedures, which must be in a Dispatcher's hand at the time an action is executed; Level II procedures, which must be at the job site and readily available; and Level III procedures, which constitute reference material. (Goetz Dep., Ex. 5 to Pls.' 56.1 Resp., at 30.)[2] Goetz also testified that the procedures themselves state that "there's no power high enough to violate a procedure" (*Id.* at 29-30), and further testified that Dispatchers have no authority to change or deviate from procedures. (*Id.* at 20-21.) Plaintiff Raney recalled ComEd's emphasis on following procedures, testifying that management would send strongly worded messages to Dispatchers warning them to follow standard operating procedures in order to avoid safety incidents. (Raney Dep. at 264-65.)

---

[2] Neither party has produced any of these procedures.

### B.     Compensation

The rate ComEd pays its Dispatchers for overtime work is the focus of Plaintiffs' FLSA and IMWL claims.  Dispatchers primarily worked twelve-hour shifts, and although their shifts might add up to more or less than forty hours in a given week, a Dispatcher's scheduled shifts were meant to average forty hours per week over a three-week period.  (Zelenika Dep at 201; Raney Dep. at 36-42; Caporelli Dep. at 68-69; Smith Dep. at 175-76.)  Plaintiffs contend that prior to 2001, ComEd treated all Dispatchers as non-exempt employees under FLSA, compensating them at one-and-one-half time or double-time for hours worked in excess of their normally scheduled shifts.  (Pls.' 56.1 ¶¶ 53-54; Zelenika Dep. at 272-73.)  Defendant admits that prior to 2001, ComEd treated Operating Dispatchers (later Distribution System Dispatchers I and II) as non-exempt employees, but contends that Load Dispatchers (later Senior Distribution System Dispatchers) have always been exempt, salaried employees, who merely received "compensatory time off" for working extra hours—though they appear to have received such paid leave at time-and-one-half or double-time rates.  (Def.'s 56.1 ¶ 26; Zelenika Dep. at 260.)  Regardless of how they may have been compensated in the past, the parties agree that during all times relevant to this dispute, ComEd treated all Dispatchers as FLSA-exempt employees, compensating them on a straight-time basis for working extra hours or extra shifts.  (Def.'s 56.1 ¶ 27.)

Despite the reduction in their overtime compensation rates, ComEd Dispatchers remained well compensated.  Plaintiffs' and Opt-In Plaintiff Smith's total compensation, including overtime paid on a straight-time basis, exceeded $100,000 per year, or a *pro rata* portion of that amount for years in which they did not work an entire year.[3]  Excluding overtime, the portion of a Dispatcher's

---

[3]     Zelenika earned $114,254.67 in 2006 before ComEd terminated his employment on November 14, 2006.  (Zelenika Dep. at 27.)  Raney made more than $100,000 per year from 2006 to 2008, and $87,079.85 from January through August 2009, before he resigned.  (Raney Dep. at 47.)  Caporelli earned approximately $107,000 in 2006; $72,848 for eight months in 2007 before leaving ComEd to work for American Transmission Co., a retail electric supplier located outside of
(continued...)

total compensation constituting base salary could be docked if he missed a full day of work and had no vacation, sick time, or personal time remaining, though Plaintiffs do not contend that ComEd ever docked their compensation for missed days. (Pls.' 56.1 Resp. ¶ 108-09.) Plaintiff contends that ComEd did also dock compensation when Dispatchers arrived late to work or otherwise missed a fraction of a day; again, however, Plaintiffs themselves never missed fractions of days, and the only evidence they cite for their assertions that this docking occurred is their personal impression that it was management's practice. (Pls.' 56.1 Resp. ¶ 106.)[4]

## II.    Zelenika's Termination

Plaintiff Zelenika also charges ComEd with retaliatory discharge, claiming that ComEd terminated his employment because of his numerous complaints to management about Dispatcher working conditions. Zelenika claims that he spoke on several occasions with his supervisors —including Shift Managers Peretti and Richard Urban, and Vince Ransom, the OCC Operations Manager—about issues including failure to provide Dispatchers with meal breaks and rest periods, staffing shortages, unmanageable workloads, and the reduction in the number of field personnel assigned to each crew. (Fourth Am. Compl. ¶¶ 38-39; Zelenika Dep. at 55-56.) Zelenika asserts that his objections on these matters were motivated by his concern that these conditions caused fatigue that could lead to Dispatcher error, putting the health and safety of ComEd personnel and the public at risk. (Fourth Am. Compl. ¶ 39; Zelenika Dep. at 57-59.)

---

[3](...continued)
Milwaukee, Wisconsin; $35, 914 for three months in 2008 after returning to ComEd; and $43,959 for three and a half months in 2009 before leaving ComEd to work for an electric supplier in Little Rock, Arkansas. (Caporelli Dep. at 15-22, 45-46.) Finally, Smith, who was employed as a Distribution System Dispatcher II, earned more than $100,000 in both 2007 and 2008, and $59.253.40 from January 2009 until her resignation in July 2009. (Smith Dep. at 29-30.)

[4]     Plaintiffs also cite to the deposition testimony of Shift Manager Peretti and Timothy McGuire, former Director of the OCC, but both of these deponents testified that they are not aware of a case where they or management docked the pay of a Dispatcher for arriving late to work. (Peretti Dep. at 97-98; McGuire Dep., Ex. 13 to Pls.' 56.1 Resp., at 17.)

Specifically, Zelenika contends that on an almost daily basis, he and other Dispatchers lodged complaints that they were not given meal breaks and were forced to eat, if they were able to eat at all, at their desks while they continued to monitor the system. (Zelenika Dep. at 55-56.) Plaintiff Raney confirmed that he was present on several occasions when Zelenika raised such complaints, and both Plaintiffs Raney and Caporelli likewise objected to ComEd's meal break policy, though Plaintiffs agree that Zelenika was more vocal about his objections. (Raney Dep. at 216-20; Caporelli Dep. at 152-54.) Zelenika further contends that sometime in 2005 or 2006 Ransom confronted him outside of a meeting at which safety complaints were raised and asked Zelenika why he "fel[t] the need to always raise issues . . . and defend other people." (Zelenika Dep. at 89.)

For their part, members of ComEd's management testified that either Zelenika never complained about ComEd's meal break policy or that they did not recall Zelenika making such complaints. (Peretti Dep. at 87-90; McGuire Dep. at 56; Urban Dep., Ex. 11 to Pls.' 56.1 Resp., at 23; Ransom Dep., Ex. 8 to Pls.' 56.1 Resp., at 80-83; Hallihan Dep., Ex. 14 to Pls.' 56.1 Resp., at 10-12.) Instead, Defendant contends that Zelenika's termination was the result of an investigation into inappropriate uses of Com-Ed computers.

In September 2006, Dispatcher Sean O'Malley lodged a complaint that Dispatchers were using ComEd's e-mail and computer systems to view and exchange pornographic images. (Ransom Dep. at 48-54.) O'Malley brought the issue to the attention of OCC Operations Manager Ransom, as well as OCC Director McGuire and Senior Human Relations Generalist Patrick Hallihan. (Def.'s 56.1 ¶ 34.) ComEd management brought in Teresa Strayer, an employee in Exelon's Case Management/Employee Dispute Resolution unit, to conduct an investigation. (*Id.* at 35.) Strayer was given the assignment because of her experience in conducting internal investigations of employment harassment claims throughout Exelon. (*Id.*)

On September 27, 2006, Strayer met with O'Malley to discuss his complaint, at which time O'Malley listed names of eight Dispatchers who he alleged had used ComEd computers and e-mail systems to view and share pornography.  (Strayer Aff., App. Q to Def.'s 56.1, ¶¶ 5, 9.)  Zelenika's name was not among those eight.  (Def.'s 56.1 ¶ 36.)  Working with ComEd's Information Technology Department, Strayer then obtained the contents of the named employees' ComEd e-mail accounts and a record of their internet activity.  (Stayer Aff. ¶ 10.)

Where Strayer's investigation produced evidence that inappropriate material had been sent to one of the named employees by other ComEd employees, Strayer expanded her investigation to those other ComEd employees.  (*Id.* ¶ 11.)  In this manner, Stayer discovered that Zelenika had forwarded a web link to a pornographic video to two of the employees whom O'Malley had named.  (*Id.* ¶ 15.)  Strayer obtained and examined the contents of Zelenika's e-mail account to confirm that the message containing the link was sent from Zelenika's account.  (*Id.*)  Zelenika cannot recall forwarding the link and asserts that he did not watch enough of the video to discern that it was pornographic.  (Pls.' 56.1 Resp. ¶ 39.)[5]

Strayer classified the inappropriate material she discovered into three categories, which she contends were used in a 2003 investigation of employee e-mail usage elsewhere at Exelon.  (Strayer Aff. ¶ 12.)  From least to most egregious, "Level 1" content included "items of a non-business nature that were inappropriate and in poor taste but that were only mildly, if at all, sexually, racially or ethnically offensive"; "Level 2" content included "items containing sexually offensive content including partial nudity but not full frontal nudity or depictions of sex acts"; and "Level 3" content included "images depicting sex acts or full frontal nudity."  (*Id.*)  In making her disciplinary recommendations, Strayer also noted whether an employee had, least egregiously, received but deleted the inappropriate content; received and saved the content, either in ComEd's

---

[5]     Because the video depicts a "stripper magician," the most graphic images occur at the end of the video after the subject has removed all of her clothes.  (Def.'s 56.1 ¶ 42.)

system or by forwarding the content to his own personal e-mail address; or, most egregiously, received and forwarded the item to someone else over ComEd's e-mail system. (*Id.* ¶ 13.) The content found in Zelenika's account fell within the most egregious of these classifications because it depicted full frontal nudity and Zelenika had forwarded it to two other ComEd employees. (*Id.* ¶¶ 16, 20.)

Based on these criteria, as well as the amount of inappropriate content found on each employees' account, Strayer prepared a document summarizing her findings and disciplinary recommendations. Strayer was unaware that Zelenika had made complaints about meal breaks and other working conditions at the time she prepared this report. (*Id.* ¶ 19.) Strayer recommended the discharge of Zelenika and two other employees who had forwarded Level 3 content to other ComEd employees. (Email Investigation, Ex. C to Strayer Aff.) For those employees whose ComEd accounts contained Level 1 or 2 material, or had not forwarded inappropriate material to any other employee, Strayer recommended discipline ranging from warning letters to ten-day suspensions. (*Id.*) On November 14, 2006, ComEd's Ransom, Urban, Hallihan, and Strayer met with Zelenika and the two other Dispatchers who were to be discharged and informed them of ComEd's decision to terminate their employment. (Def.'s 56.1 ¶ 47.)

## DISCUSSION

The court grants a motion for summary judgment when there are no genuinely disputed issues of material fact and a claim can be resolved as a matter of law. FED. R. CIV. P. 56(a). The court views the facts and makes all reasonable inferences in favor of the non-moving party. *Schaefer-LaRose v. Eli Lilly & Co.*, 679 F.3d 560, 571 (7th Cir. 2012). No genuine issues of material fact exist "when no reasonable jury could find in favor of the non-moving party." *Smith v. Lafayette Bank & Trust Co.*, 674 F.3d 655, 657 (7th Cir. 2012). Where, as here, the parties have filed cross-motions for summary judgment, the court adopts a "Janus-like perspective: As to each

motion the nonmovant's version of any disputed facts must be credited." *Adkins v. Local 705 Int'l Bhd. of Teamsters Pension Fund*, 787 F. Supp. 2d 812, 814 (N.D. Ill. 2011).

## I. FLSA Overtime Claim

### A. Procedural Obstacles

Before turning to the merits of the FLSA overtime claim, the court addresses Defendant's argument that Plaintiffs' claim is procedurally barred. Plaintiffs purport to bring this action on their own behalf and on behalf of other similarly situated employees. FLSA allows for such representative actions, but unlike class actions brought under Federal Rule of Civil Procedure 23(b), requires similarly situated employees to affirmatively opt in if they are to be bound by the outcome of the lawsuit: "No employee shall be party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." 29 U.S.C § 216(b). The Opt-In Plaintiffs have filed such consents with this court, but the Named Plaintiffs have not. Defendant argues that the Named Plaintiffs' failure to file opt-in notices bars them, but not the Opt-In Plaintiffs, from maintaining their FLSA claim. Plaintiffs respond that because they are named in the complaint, they were not required to file written consents to opt in to the representative action.

The Seventh Circuit has not directly answered this question. In *Anderson v. Montgomery Ward & Co.*, thirty-nine terminated employees brought an Age Discrimination in Employment Act (ADEA) claim as a joint action against their employer. 852 F.2d 1008, 1009 (7th Cir. 1988).[6] Because several of the plaintiffs had failed to file timely EEOC complaints, the district court required and allowed the plaintiffs to amend their complaint to convert the claim into a representative action, reasonin that in a representative action, but not a joint action, the claims of

---

[6] The ADEA borrows its enforcement provisions and procedures from FLSA. *See* 29 U.S.C. § 626(b); *Anderson*, 852 F.2d at 1014 (citing *Lorillard v. Pons*, 434 U.S. 575, 579 (1978)).

those plaintiffs who brought untimely EEOC complaints could relate back to the claims of those plaintiffs who had filed timely EEOC complaints. *Id.* at 1012. The employer brought an interlocutory appeal, arguing, among other things, that the statute of limitations for those plaintiffs with untimely EEOC claims had expired because the employees who did not file timely EEOC complaints also did not file written consents with the district court when the case was converted to a representative action. *Id.* at 1018.

The Seventh Circuit concluded that because the untimely claims could relate back to timely ones even in joint actions, there was no need for the plaintiffs to amend their complaints into a representative action, and therefore no need for them to file opt-in notices with the district court. *Id.* Nevertheless, citing the decisions in several Fifth and Sixth Circuit cases, the court went on to observe that "the requirement that plaintiffs in a representative action file a written consent with the district court applies only to those parties who are not named as plaintiffs in the complaint." *Id.* at 1018-19 (citing *Allen v. Atl. Richfield Co.*, 724 F.2d 1131, 1135 (5th Cir. 1984); *Morelock v. NCR Corp.*, 586 F.2d 1096, 1103 (6th Cir. 1978), *cert. denied*, 441 U.S. 906 (1979); *LaChapelle v. Owens-Illinois, Inc.*, 513 F.2d 286, 289 n.10 (5th Cir. 1975)). As the *Anderson* court explained:

> In the present case, all the plaintiffs are named in the complaint; they have hired an attorney; and they have actively participated in the litigation. ADEA does not then require that these plaintiffs file a routine written consent whose only purpose is to notify the court and the defendants that the plaintiffs agree to participate in the lawsuit.

*Id.* at 1019.

In *Harkins v. Riverboat Services, Inc.*, the Seventh Circuit revisited the issue and characterized the *Anderson* court's conclusion about the necessity of named plaintiffs filing written consent as "the purest dictum." 385 F.3d 1099, 1102 (7th Cir. 2004). In *Harkins*, twenty-one former riverboat casino employees filed a FLSA overtime claim, which they styled as a representative action even though all twenty-one employees were named in the complaint. *Id.* at 1100-01. The district court dismissed the claims of eighteen of these plaintiffs because they had

13

failed to file a written notice of consent to the representative action. *Id.* at 1101. The Seventh Circuit affirmed, concluding that FLSA "is unambiguous: if you haven't given your written consent to join the suit, or if you have but it hasn't been filed with the court, you're not a party. It makes no difference that you are named in the complaint, for you might have been named without your consent." *Id.* The court read *Anderson* to hold merely that written opt-in notices from named plaintiffs are unnecessary only when a FLSA case is brought as a joint action. *Id.* Because the plaintiffs had captioned their case as a representative action, and never subsequently converted their case to a joint action, the court affirmed the district court's decision dismissing the claims of those plaintiffs who had not filed opt-in notices. *Id.* at 1102.

FLSA's statute of limitations provision supports the *Harkins* court's reading of FLSA's plain language with regard to the need for named plaintiffs to file written notice. In the case of representative actions, an individual claimant's action is considered commenced:

> (a) on the date when the complaint is filed, if he is specifically named as a party plaintiff in the complaint *and* his written consent to become a party plaintiff is filed on such date in the court in which the action is brought; or
>
> (b) if such written consent was not so filed or if his name did not so appear—on the subsequent date on which such written consent is filed in the court in which the action was commenced.

29 U.S.C. § 256 (emphasis added). This language demonstrates Congress's expectation that in addition to the complaint, named plaintiffs need also file their written consent in representative actions. Indeed, the action is not considered commenced for statute of limitations purposes until the written consent is filed. Though this court is sympathetic to the argument that a written opt-in notice is redundant when named plaintiffs have already filed a complaint, and this court might have made a different choice in drafting FLSA if writing on a blank slate, it is not this court's "job to protect the people from the consequences of their political choices." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2579 (2012).

14

Whether the Named Plaintiffs' failure to file written consents completely bars consideration of the FLSA claim is a tricky question. Defendant suggests that the Opt-In Plaintiffs may continue to pursue their FLSA claims. But the Opt-In Plaintiffs are not named plaintiffs, and are parties to this action only to the extent that they have accepted the Named Plaintiffs' representation. Looking to the rules governing class actions for guidance, allowing the Named Plaintiffs to continue representing the Opt-In Plaintiffs on claims for which the Named Plaintiffs' statute of limitations has run would violate the typicality and adequacy of representation prerequisites, to say nothing of Article III standing. *See* FED. R. CIV. P. 23(a).

One potential solution is for the court to order this case converted to a joint action. Both *Anderson* and *Harkins* noted that written consent is not required for joint actions. With only three Named Plaintiffs and five Opt-In Plaintiffs, a joint action would not be unmanageable. Though it is late in this litigation to add additional named plaintiffs post-discovery, there would be no apparent prejudice to Defendant where the Opt-In Plaintiffs other than Smith have already agreed to be bound by the testimony and facts presented by the Named Plaintiffs and Smith. Converting this case into a joint action will not be necessary, however, because the court concludes that Defendant is entitled to summary judgment on the merits of Plaintiffs' FLSA claim.

### B. Administrative Exception

FLSA's maximum hours provision, 29 U.S.C § 207, entitles employees to overtime pay at a rate not less than one-and-one-half times the employees' regular rate for hours worked in excess of forty hours per week, subject to various exemptions. *See Schaefer*, 679 F.3d at 572. ComEd has raised two of these exemptions as affirmative defenses: the administrative and executive exemptions established by 29 U.S.C. § 213(a)(1). "The burden is on the employer to establish that an employee is covered by the exemption." *Schaefer*, 679 F.3d at 571 (citing *Corning Glass Works v. Brennan*, 417 U.S. 188, 196-97 (1974)).

15

Pursuant to statutory authority, the Secretary of Labor has promulgated rules establishing three requirements for an employee to fall within FLSA's administrative exemption: (1) the employee must be compensated on a salary or fee basis at a rate not less than $455 per week; (2) the employee's primary duty must be "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers"; and (3) the employee's primary duty must include "the exercise of discretion and independent judgment with respect to matters of significance."  29 C.F.R. § 541.200.  The Secretary has established a shorter test for an employee whose total compensation meets or exceeds $100,000; an employer need only establish that such an employee "regularly performs any one or more of the exempt duties or responsibilities" of a bona fide administrative employee.  29 C.F.R. § 541.601(a).  Consequently, for highly compensated employees, an employer need prove only one of requirements (2) and (3) of the general test, not both.

### 1.    Minimum Guarantee on a Salaried Basis

Where an exempt employee receives a minimum guarantee of $455 per week on a salary basis, an employer may establish additional compensation "based on hours worked for work beyond the normal workweek.  Such additional compensation may be paid on any basis (e.g., flat sum, bonus payment, *straight-time hourly amount*, time and one-half or any other basis) . . . ."  29 C.F.R. § 541.604(a) (emphasis added).  Although there is no dispute that Plaintiffs' compensation exceeded this minimum, Plaintiffs contend that Dispatchers are not paid on a salaried basis, and are therefore non-exempt employees entitled to time-and-a-half for overtime hours worked.

Regulations define "salary basis" as when an employee's compensation "is not subject to reduction because of variations in the quality or quantity of the work performed."  29 C.F.R. § 541.602(a).  The prohibition against deductions is subject to certain exceptions, however.  For example, an employer may deduct pay for absences of one or more full days for personal reasons

16

or full-day absences for sickness or disability in excess of those covered by an employer's leave policies. *See* 29 C.F.R. § 541.602(b)(1)–(2). Generally, an employer cannot deduct pay for an exempt employee's absences of less than one day, such as when an employee arrives late or leaves early. *See Klein v. Rush-Presbyterian-St. Luke's Med. Ctr.*, 990 F.2d 279, 284 (7th Cir. 1993); *Kennedy v. Commonwealth Edison Co.*, 252 F. Supp. 2d 737, 742 (C.D. Ill. 2003), *aff'd* 410 F.3d 365 (7th Cir. 2005). An employer who makes improper deductions from salary loses the benefits of the FLSA exemption "if the facts demonstrate that the employer did not intend to pay employees on a salary basis." 29 C.F.R. § 541.603(a).

In support of their argument that they were not paid on a salaried basis, Plaintiffs point to evidence in the record that ComEd had a policy of docking pay when a Dispatcher missed a full day and had no vacation, sick time, or personal time remaining. But the first two exceptions in 29 C.F.R. § 541.602(b) make clear that full-day deductions are permissible under such circumstances. Plaintiffs also argue that Dispatchers were subject to deduction in pay for absences of less than one day, but the only evidence they cite is Plaintiffs' own testimony that Dispatchers were under the impression, fostered by management, that Dispatchers could be docked pay for arriving late or leaving their shifts early. Plaintiffs were not themselves subject to the improper deductions they allege. Plaintiffs' mere impression that their pay could be docked for such absences, supported only by affidavits lacking necessary foundation, is not sufficient to overcome Defendant's motion for summary judgment. *See Keri v. Bd. of Trs. of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006) ("Conclusory allegations and self-serving affidavits, if unsupported by the record, will not preclude summary judgment."). The court therefore concludes that Plaintiffs were salaried employees.

## 2. Highly Compensated Employees

As a threshold issue, Plaintiffs contend that Defendant failed to plead the rule for highly compensated employees as an affirmative defense in its Answer, and that the exception is

17

therefore waived. In order "to give the opposing party notice of the affirmative defense and a chance to rebut it," Federal Rule of Civil Procedure 8(c) requires a party to plead affirmative defenses in its answer. *Williams v. Lampe*, 399 F.3d 867, 871 (7th Cir. 2005). The court concludes that Defendant's Answer, which raises the administrative and executive exemptions as affirmative defenses, is sufficient. The "highly compensated employees" rule is a regulatory gloss on the administrative and executive exemptions, not a separate affirmative defense. Part 541 of the Code of Federal Regulations, which contains the highly compensated employees provision, defines and delimits the administrative exemption established by 29 U.S.C. § 213. Plaintiffs cannot claim unfair surprise that Defendant attempts to proceed under this rule because Plaintiffs are presumably aware of how much they earned as ComEd employees. Further, Plaintiffs cannot show prejudice because the factors Defendant must prove to establish the administrative exemption remain the same; Defendant need only prove fewer of them.

Next, Plaintiffs urge this court to ignore the overtime paid on a straight-time basis in calculating Plaintiffs' total compensation for purposes of the highly compensated employee rule. The regulations are at odds with Plaintiffs' position, however. They define "total annual compensation" to include "commissions, nondiscretionary bonuses and other nondiscretionary compensation," and exclude "board, lodging . . . payments for medical insurance, payments for life insurance, contributions to retirement plans and the cost of other fringe benefits." 29 C.F.R. § 541.601(b)(1). The regulations further provide that newly hired employees or those employees who leave before the year is out may qualify as highly compensated employees if their total compensation equals or exceeds a *pro rata* portion of the $100,000 minimum. 29 C.F.R. § 541.601(b)(3). Plaintiffs argue that in calculating total compensation, "an employer may not include illegal payments of overtime." (Pls.' Reply in Supp. of Pls.' Mot. for Summ J. at 15 (internal quotation marks omitted).) But overtime payments, based on the number of additional hours

worked, plainly constitute a form of nondiscretionary compensation contemplated by 29 C.F.R. § 541.601(b)(1).[7]

Neither is the court convinced by Plaintiffs' argument that Dispatchers fall within the 29 C.F.R. § 541.601(d) exception for highly compensated employees whose primary duties include manual work. Plaintiffs are correct that the highly compensated employee rule "applies only to employees whose primary duty includes performing office or non-manual work." 29 C.F.R. § 541.601(d). In support of their argument that Dispatchers fall outside that category, Plaintiffs cite regulations and Department of Labor advisories that list "non-management production-line workers and non-management employees in maintenance, construction and similar occupations" who are excluded from the highly compensated employee rule. Among those workers that Plaintiffs liken to Dispatchers are electricians, operating engineers, and computer operators. 29 C.F.R. § 541.601(d); *see also* U.S. Dep't of Labor, *FLSA Overtime Security Advisory*, http://www.dol.gov/ elaws/esa/flsa/overtime/jobs.htm (last visited July 19, 2012).

The court is not persuaded by the analogy. The unifying feature among these nonexempt blue-collar workers is that their work involves "repetitive operations with their hands, physical skill and energy." Wage and Hour Div., U.S. Dep't of Labor, *Fact Sheet #17I: Blue-Collar Workers and the Part 541 Exemptions under the Fair Labor Standards Act (FLSA)*, http://www.dol.gov/whd/regs/

---

[7]     Plaintiffs also argue that it is inequitable to allow Defendant to avoid paying time-and-a-half or double-time rates by encouraging Dispatchers to work enough overtime to barely exceed the $100,000 minimum. Again, the law is at odds with Plaintiffs' position. The regulations specifically authorize a mechanism by which employers can avoid significant overtime liability for a fraction of the cost. For employees whose total compensation for a 52-week period is less than $100,000, an employer may "make one final payment sufficient to achieve the required level." 29 C.F.R. § 541.601(b)(2). Thus, adapting the example offered by the regulations, for an otherwise non-exempt employee who makes $80,000 in base salary and earns $1 shy of $20,000 in overtime on a straight-time basis, an employer could avoid some $10,000 to $20,000 in overtime liability by making a final $1 payment, if the employee would then be rendered exempt under the "highly compensated employees" rule.

compliance/fairpay/fs17i_blue_collar.pdf (last visited July 23, 2012). Though Plaintiffs worked with electricians in the field crews, Dispatchers are not responsible for the physical act of conducting the maintenance or installation of electrical systems. The job title of "operating engineer" is likewise inapplicable because that position involves the operation of construction equipment such as bulldozers and tractors. *See* Bureau of Labor Statistics, U.S. Dep't of Labor, *2010 Standard Occupational Classification Definitions* 141, at Code No. 47-2073, *available at* http://www.bls.gov/soc/soc_2010_definitions.pdf. Finally, although a Dispatcher's job involves monitoring and operating computer systems, Plaintiffs do not allege that Dispatchers perform the type of repetitive hand or physical motions required for those occupied as "computer operators" to fall within the 29 C.F.R. § 541.601(d) exception.

Because Plaintiffs and Opt-In Plaintiff Smith performed non-manual office work and received total compensation exceeding $100,000 for a full year's work, or a *pro rata* portion of that amount for years in which they left or returned to ComEd employment, their FLSA overtime claim is subject to the highly compensated employees rule. Consequently, in order to prove Plaintiffs' FLSA-exempt status, Defendant need only establish that Plaintiffs' primary duty *either* was non-manual work related to ComEd's management or general business operations *or* involved the exercise of discretion and independent judgment with respect to matters of significance.

### 3. Non-Manual Work Related to ComEd's General Business Operations

Plaintiffs do not contest that a Dispatcher's primary responsibilities involve non-manual office work. Further, because their briefs focus exclusively on the discretion and independent judgment prong of the administrative exemption, Plaintiffs do not challenge Defendant's assertion that Plaintiffs' primary duties were related to ComEd's general business operations. In any event, as explained below, such a challenge would not be successful.

The regulations define "directly related to the management or general business operations" as work that is "directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a). A Dispatcher's duties—monitoring and responding to problems with ComEd's electrical distribution system in collaboration with field crews—fall within several of the functional areas identified in subsection (b), including quality control and personnel management. Notably, the Seventh Circuit rejected an argument made by work planners at a ComEd nuclear power plant, who performed functions similar to those of the ComEd Arrangers mentioned in connection with this case, that by "creating instructions for maintenance and repair of ComEd's machines," they fell on the production side of the administrative/production line. *Kennedy*, 410 F.3d at 373. The Seventh Circuit concluded that "[t]he mere fact that their advice and planning relates directly to plant operations is not enough to make them, personally, the actual production employees." *Id.* Though ComEd Dispatchers likely work more closely with the field crews than the work planners in *Kennedy* did with those employees who completed repairs*,* Dispatchers similarly "do not turn the wrenches themselves." *Id.*

The court therefore concludes that Plaintiffs' primary duties as Dispatchers were related to ComEd's general business operations. Consequently, because Plaintiffs were highly compensated employees, the court need not consider whether those duties involve the exercise of discretion and independent judgment with respect to matters of significance. Further, because Defendant has established that the administrative exemption applies, the court need not consider the executive exemption. Defendant's motion for summary judgment is granted with respect to Plaintiffs' FLSA claim.

## II.     IMWL Overtime Claim

### A.     Supplemental Jurisdiction

Having granted summary judgment on the FLSA claim, the court must decide whether to retain jurisdiction over the state overtime claim, or remand the claim to state court. There is a presumption in favor of remanding claims brought on a federal court's supplemental jurisdiction when all federal claims have been dismissed. *See RWJ Mgmt. Co. v. BP Prods. N. Am., Inc.*, 672 F.3d 476, 479 (7th Cir. 2012). The court considers several factors in determining whether to retain jurisdiction, including whether

> (1) the statue of limitations has run on the pendent claim, precluding the filing of a separate suit in state court; (2) substantial juridical resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) when it is absolutely clear how the pendent claims can be decided.

*Id.* at 480 (quoting *Sharp Elecs. Corp. v. Metro. Life Ins. Co.*, 578 F.3d 505, 514-15 (7th Cir. 2009)).

In this case the statute of limitations is not an issue because the case originated in state court, and can therefore be remanded. Considerations of judicial economy weigh in favor of retaining jurisdiction, however. Motions for dismissal and summary judgment have been fully briefed and, as of this Order, decided. A motion for class certification is pending. If Plaintiffs' IMWL claim could be resolved on the same grounds as Plaintiffs' FLSA claims, the factors would militate in favor of the court retaining jurisdiction to do so.

The law governing Plaintiffs' state overtime claim is different from FLSA in a critical respect, however. The IMWL applies the administrative and executive exemptions "as defined by or covered by the Federal Fair Labor Standards Act of 1938 and the rules adopted under that Act, *as both exist on March 30, 2003*." 820 ILCS 105/4a(2)(E) (emphasis added). Thus, Plaintiffs' state overtime claim is governed by the FLSA regulations that existed prior to the comprehensive amendments of April 23, 2004, which altered the definition of individuals "employed in a bona fide

22

executive administrative, or professional capacity." *See* Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 69 Fed. Reg. 22,122, 22,260-74 (April 23, 2004).

As explained in the Seventh Circuit's decision in *Kennedy*, the old regulations had "a long test, see 29 C.F.R. § 541.2(a)-(e) (2001), and a short test, see 29 C.F.R. § 541.214 (2001), to determine whether an employee fell within the administrative exception." *Kennedy*, 410 F.3d at 370. Prior to the 2004 amendments, all employees "compensated on a salary or fee basis at a rate of not less than $250 per week," or $13,000 per year, were subject to the short test, which mirrored the general test in the present regulations: employers had to establish compensation on a salaried basis, primary duties of non-manual work related to management or general business operations, *and* primary duties involving the exercise of discretion and independent judgment. 29 C.F.R. § 541.214 (2003). Though this court has already concluded that Plaintiffs are salaried employees whose primary duties were non-manual work related to ComEd's general business operations, the question still remains whether Plaintiffs' primary duties involved the exercise of discretion and independent judgment.

The answer to this question is not clear. Nevertheless, the court believes that retaining supplemental jurisdiction is warranted. Although the remaining overtime claim is a state cause of action, it concerns a question of federal law, which federal courts are particularly well suited to resolve.

**B.    Exercise of Discretion and Independent Judgment**

The 2003 regulations interpreted the exercise of discretion and independent judgment to involve "the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.207(a) (2003). Though the short test did not specify that the exercise of discretion and independent judgment had to be with respect to significant matters, the regulations interpreting that term explained that "the

23

discretion and independent judgment exercised must be real and substantial, that is, they must be exercised with respect to matters of consequence." *Id.* § 541.207(d)(1). The regulations further distinguished between the exercise of such discretion and "the use of skill in applying techniques, procedures, or specific standards." *Id.* § 541.207(b). In particular, the regulations explained that "[a]n employee who merely applies his knowledge in following prescribed procedures or determining which procedure to follow . . . is not exercising discretion and independent judgment within the meaning of § 541.2." *Id.* § 541.207(c)(1).

Moreover, the term "implies that the person has the authority or power to make an independent choice, free from immediate direction or supervision and with respect to matters of significance." *Id.* § 541.207(a). This interpretation does not "necessarily imply that the decisions made by the employee must have a finality that goes with unlimited authority and complete absence of review," however. *Id.* § 541.207(e)(1). "The fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment . . . ." *Id.*; *see also Kennedy*, 410 F.3d at 374 (interpreting the pre-amendment regulations).

To qualify for the administrative exemption, ComEd must also show that Plaintiffs' duties calling for the exercise of discretion and independent judgment were Plaintiffs' primary duties. Generally, "primary duty" means "the major part, or over 50 percent, of the employee's time." 29 C.F.R. § 541.103 (2003). But the court considers several other factors even where employees fall below this threshold, including "the relative importance of the managerial duties as compared with other types of duties, the frequency with which the employee exercises discretionary powers, [and] his relative freedom from supervision." *Id.* "Although the totality of plaintiff's duties are relevant . . . [t]he employee's primary duty 'is that which is of principal importance to the employer, rather than collateral tasks which may take up more than fifty percent of his or her time.'" *Demos v. City*

*of Indianapolis*, 302 F.3d 698, 704-05 (7th Cir. 2002) (quoting *Reich v. Wyoming*, 993 F.2d 739, 742 (10th Cir. 1993)).

Viewing each party's motion for summary judgment in the light most favorable to the non-moving party, the court concludes that there are issues of material fact that preclude granting summary judgment for either side on the IMWL claim. Viewed in the light most favorable to the Defendant, ComEd Dispatchers are required to create switching routines to complete unplanned repairs in emergency situations, which occur on a daily basis and concern the safety of ComEd equipment, employees in the field, and the public. Defendant notes that ComEd's job description for Dispatchers is replete with references to judgment and discretion (Sr Dist Sys Dispatcher Position Description, Ex. A-1 to Pinto Aff.), and that Dispatchers are extensively trained in a classroom setting and with on-the-job shadowing before allowed to assume their responsibilities on their own. Defendant also contends that Dispatchers' high compensation is indicative of the use of discretion and independent judgment. Furthermore, a Dispatcher's switching routine was subject only to peer review in certain emergent situations, according to Shift Manager Peretti, and subject to no review at all in emergency outage situations.

Viewed in the light most favorable to the Plaintiffs, however, the record demonstrates that ComEd stressed the importance of following procedures. In the case of scheduled maintenance, discretion and independent judgment appears reserved for the Arrangers who prepare the routines that Dispatchers and field crews use to carry out the repairs. Defendant claims that Dispatchers have to review the Arrangers' routines before allowing work to proceed, but such review may involve the application of skill in applying techniques and procedures rather than discretion and independent judgment. All deponents appeared to agree that Dispatchers have no authority to deviate from standard operating procedures.

As for emergent situations, which appear to occupy approximately twenty percent of a dispatcher's time, several of Defendant's witnesses admitted that ComEd developed more

25

standardized procedures for Dispatchers both before and during the period relevant to this lawsuit, going at least as far as creating three levels of procedures, some of which Dispatchers were required to have in their hands when they were implementing certain actions. ComEd repeatedly stressed the importance of the standard operating procedures and the role they played in ensuring safety. ComEd protocol cautions that there is "no power high enough to violate procedure." (Goetz Dep. at 29-30.) Though Plaintiffs do not dispute that Dispatchers are highly trained employees, it does not necessarily follow that the training was meant to cultivate or channel the exercise of discretion and independent judgment. Dispatchers would not be using discretion and independent judgment within the meaning of Part 541 if they simply applied their skill to following ComEd standard procedures or in selecting which of those procedures to follow. Plaintiffs also stress that the creation of switching routines in emergent situations is a collaborative effort between the field crews and Dispatcher, both of whom have veto power over the other. Furthermore, disputes between a field crew and Dispatcher are resolved at a higher level, between supervisors.

This case presents a closer question on the discretion and independent judgment prong than in the cases cited by Defendant where the courts found the administrative exemption applied. In *Conroy v. City of Chicago*, the court held that city traffic control agency superintendents exercised discretion and independent judgment with regards to in-the-field emergencies. 644 F. Supp. 2d 1061, 1069 (N.D. Ill. 2009). Unlike the Dispatchers in this case, however, the superintendents there also exercised discretion as to staffing assignments. *Id.* In this regard, the superintendents in *Conroy* are most similar to Plaintiffs' Shift Managers in this case. In *Kennedy v. Commonwealth Edison Co.*, the work planners devised solutions to problems at one of ComEd's nuclear plants, to be carried out by other workers. 410 F.3d at 368. In this respect, the plaintiffs in *Kennedy* are most similar to the Arrangers in this case, who prepared the routines that Dispatchers would read to the field crew. Though the court does not doubt that Shift Managers and Arrangers at ComEd would fall within the administrative exemption, Plaintiffs have presented

sufficient evidence at this stage to survive summary judgment on the issue of Dispatchers' use of discretion and independent judgment.

### C. Executive Exemption

Plaintiffs also moves for summary judgment on Defendant's affirmative defense grounded in the executive exemption. Under the 2003 rule for executive employees, in addition to the salary requirements, an employer must show that a highly compensated employee's "primary duty consists of the management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof and includes the customary and regular direction of the work of two or more other employees therein." 29 C.F.R. § 541.119(a) (2003). Among the managerial duties listed in the regulation, relevant duties involved in management of a department or subdivision include "directing [other employees'] work; . . . planning the work; determining the techniques to be used; . . . [and] providing for the safety of the men and the property." *Id.* § 541.102(b). To demonstrate that an employee "customarily and regularly supervises at least two full-time employees," an employer must show that "[t]he employees supervised [are] employed in the department which the 'executive' is managing." *Id.* § 541.105(b).

Whether Plaintiffs directed the work of the field crews, or merely worked in collaboration with them to complete repairs, is a disputed issue of material fact. On the one hand, Defendant contends that each Dispatcher is responsible for a particular segment of ComEd's electrical distribution system—with responsibilities that include directing the field crews in implementing switching routines, creating switching routines for unplanned work, and ensuring their safety and the safety of ComEd's equipment. Defendant further contends that even if, as Plaintiffs suggest, a Dispatcher's job is limited to instructing a field crew on routines before repairs are completed, and later checking that the crews properly completed the repairs, such duties are sufficient to establish the executive exemption.

On the other hand, Plaintiffs stress the collaborative nature of the relationship between Dispatchers and field crews. It is not disputed that Dispatchers lack the authority to hire, fire, or discipline field crew personnel. Moreover, both Dispatchers and field crew appear to have a veto over the other concerning switching routines. If they could not reach an agreement on the appropriate steps, ComEd procedure calls for the Shift Manager and the field crew's supervisor to resolve the dispute. Though not a point explicitly raised by Plaintiffs, there may also be a question about whether the field crew employees are properly considered employed within the "department" Dispatchers could be considered to supervise. Field crew operations appears to be a separate department with its own management (Ransom Dep. at 11-12), and field crews have their own supervisors.

Because there exists a genuine dispute of material fact for the trier of fact to resolve, the court denies Plaintiffs' motion for summary judgment on Defendant's affirmative defense based on the executive exemption.

**III. Zelenika's Retaliatory Discharge Claim**

The court will also retain supplemental jurisdiction over Zelenika's retaliatory discharge claim because it is apparent that it is without merit and can be dismissed. To establish a claim for retaliatory discharge, an employee must show that "(1) the employer discharged the employee, (2) in retaliation for the employee's activities, and (3) that the discharge violates a clear mandate of public policy." *Turner v. Mem'l Med. Ctr.*, 233 Ill. 2d 494, 500, 911 N.E.2d 369, 374 (2009). The Illinois Supreme Court has rejected Title VII's burden-shifting framework in favor of the "traditional tort law approach to the allocation of proof." *Clemons v. Mech. Devices Co.*, 184 Ill. 2d 328, 338-39, 704 N.E.2d 403, 407-08 (1998). Consequently, the burden of proof remains on the plaintiff to demonstrate the employer's motive in discharging the employee. *Id.* 184 Ill. 2d at 336, 704 N.E.2d at 406. A defendant need not come forward with any explanation for the discharge, but "if an

employer chooses to come forward with a valid, nonpretextual basis for discharging its employees and the trier of fact believes it, the causation element require to be proven is not met." *Id.*

Illinois courts recognize that the Illinois "One Day Rest in Seven" Act is a clear mandate of public policy. *See Carty v. Suter Co.*, 371 Ill. App. 3d 784, 788, 863 N.E.2d 771, 774-75 (Ill. App. 2d Dist. 2007); *see also Thakkar v. Station Operators Inc.*, 697 F. Supp. 2d 908, 929 (N.D. Ill. 2010). The Act provides, in pertinent part:

> Every employer shall permit its employees who are to work for 7 1/2 continuous hours or longer . . . at least 20 minutes for a meal period beginning no later than 5 hours after the start of the work period.

820 ILCS 140/3. The only exceptions to this rule are for "employees for whom meal periods are established through the collective bargaining process,"[8] and "employees who monitor individuals with developmental disabilities or mental illness," who are required to be on call an entire eight-hour work period, and who, under the Act, must be allowed to eat while continuing to monitor those individuals. *Id.* A plaintiff states a cause of action for retaliatory discharge when he alleges that his employer discharged him for reporting to his supervisor that he was not receiving his statutorily mandated meal breaks. *See Carty*, 371 Ill. App. 3d at 788, 863 N.E.2d at 774-75.

Zelenika claims that his discharge was the result of complaints he made to his supervisors concerning, among other things, having to eat his lunch at his desk while continuing to monitor ComEd's electrical distribution system. Those supervisors, some of whom were involved in the decision to terminate him, deny that Zelenika complained about meal breaks. Although this might appear at first glance to be a dispute for the trier of fact, a closer examination defeats that conclusion.

---

[8] Although Zelenika claims to have been a member of the International Brotherhood of Electrical Workers Local 134 (Fourth Am. Compl. ¶ 55), Defendant does not allege that this exception applies.

No reasonable juror could find Zelenika's meal break objections to be the "but for" cause of his discharge in light of Defendant's evidence that Zelenika was discharged for distributing inappropriate material through ComEd's e-mail system. Zelenika was one of three employees discharged on the same day for using ComEd's system to forward pornographic material featuring sex acts or full-frontal nudity to other ComEd employees. Strayer, the Exelon ethics officer, was not aware of Zelenika's complaints when she conducted her investigation and recommended Zelenika's discharge. Zelenika objects to the criteria Strayer used to make her recommendation to terminate Zelenika's employment and the process ComEd afforded him to appeal his discharge, but the court expresses no view on these issues. Federal courts "'do not sit as a superpersonnel department' where disappointed applicants or employees can have the merits of an employer's decision replayed to determine best business practices." *Blise v. Antaramian*, 409 F.3d 861, 867 (7th Cir. 2005) (quoting *Holmes v. Potter*, 384 F.3d 356, 361-62 (7th Cir. 2004)).

Defendant's motion for summary judgment is granted with respect to Plaintiff Zelenika's retaliatory discharge claim.

## CONCLUSION

For the reason above, Defendant's motion for summary judgment [115] is granted in part and denied in part. Defendant's motion is granted with respect to Plaintiffs' FLSA claim (Count I) and Zelenika's retaliatory discharge claim (Count V), but denied with respect to Plaintiffs' IMWL claim (Count II). Plaintiffs' motion for summary judgment [113] is denied in all respects. A status hearing will be set to schedule further briefing on Plaintiffs' Motion for Class Certification of State Law Overtime Claims [123].

ENTER:

Dated: July 23, 2012

REBECCA R. PALLMEYER
United States District Judge